**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| MOVING OXNARD FORWARD, INC., | No.21-56295 |
| *Plaintiff-Appellant*, | D.C. No. 2:20-cv-04122-CBM-AFM |
| v. | |
| LOURDES LOPEZ, in her official capacity as City Clerk for the City of Oxnard, | OPINION |
| *Defendant-Appellee*, | |
| and | |
| DOES, 1 through 25, inclusive, | |
| *Defendants*. | |

Appeal from the United States District Court
for the Central District of California
Consuelo B. Marshall, District Judge, Presiding

Argued and Submitted En Banc September 9, 2025
San Francisco, California

Filed April 22, 2026

Before: Mary H. Murguia, Chief Judge, and Kim McLane Wardlaw, Consuelo M. Callahan, Jacqueline H. Nguyen, John B. Owens, Ryan D. Nelson, Eric D. Miller, Daniel P. Collins, Lawrence VanDyke, Lucy H. Koh and Jennifer Sung, Circuit Judges.

Opinion by Judge Koh;
Dissent by Judge Collins

_____

# SUMMARY[*]

_____

## First Amendment/Campaign Contribution Limits

The en banc court affirmed the district court's grant of summary judgment to the City of Oxnard (the "City"), in a case in which Moving Oxnard Forward ("MOF"), a political advocacy nonprofit organization, challenged the constitutionality of certain campaign finance limitations for municipal elections included in the Oxnard Government Accountability and Ethics Act ("Measure B").

MOF alleged that Measure B's per candidate contribution limits violate the First Amendment and that the aggregate contribution limits violate the First and Fourteenth Amendments.

As to the per candidate contribution limits, the en banc court first held that the City established a sufficiently important governmental interest in preventing quid pro quo

_____

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

corruption or its appearance. Recognizing the low evidentiary bar as explained in *Lair v. Motl*, 873 F.3d 1170 (9th Cir. 2017), the en banc court held the City offered more than enough evidence to demonstrate its interest because it offered: (1) a newspaper article alleging corruption by City officials; (2) an investigation by the District Attorney, resulting in a report detailing numerous instances of behaviors that gave rise to the appearance of quid pro quo corruption; (3) a survey showing 77% of residents wanted a government accountability measure; and (4) the fact that 82% of the City's voters approved Measure B.

With the City having established a sufficiently important governmental interest in preventing quid pro quo corruption or its appearance, the en banc court next considered the four "danger signs" that contribution limits may be unconstitutionally low as set forth in *Randall v. Sorrell*, 548 U.S. 230 (2006). The en banc court held that the first three danger signs were not present because (1) Measure B's per candidate contribution limits are per candidate per election, not per office per election cycle; (2) higher limits apply to contributions from political action committees, and no contribution limits apply to political parties; and (3) the contribution limits are comparable to contribution limits imposed by other California cities of comparable size.

Because the U.S. Supreme Court has only addressed the constitutionality of state and federal contribution limits and not city contribution limits, the en banc court assumed without deciding that the fourth *Randall* danger sign— whether the City's contribution limit is below previously upheld city limits—was present. Thus, the en banc court reviewed the record independently and concluded that Measure B's per candidate contribution limits were closely drawn to the City's interest in preventing actual or apparent

quid pro quo corruption. Looking to five sets of considerations identified by the Supreme Court to determine whether contribution limits are appropriately tailored and not unconstitutionally restrictive, the en banc court held that four of the considerations—the ability of challengers to run competitive campaigns, the limits on political party contributions, treatment of volunteer services, and adjusting the contribution limits for inflation—favored Measure B. Because the first four factors weighed in the City's favor, the final consideration, the presence of a special justification, was irrelevant.

As to the aggregate contribution limits, the en banc court held that Measure B's aggregate limits are constitutional under the First Amendment, and do not improperly discriminate between candidates based on the candidate's sponsorship of ballot measures because they only apply to the candidate, and not to contributions made to ballot measure campaigns.

Dissenting, Judge Collins, joined by Judge VanDyke, would hold that the City's per candidate aggregate contribution limits on campaign contributions violate the First Amendment. In his view, the low standard applied by the majority to determine whether the City carried its initial burden to show that Measure B's individual contribution limitations further the important state interest of preventing quid pro quo corruption or its appearance is inconsistent with Supreme Court authority. He would hold that under the proper standard the City's evidence does not justify its adoption of the campaign contribution limits. However, even if the City met its threshold burden, Judge Collins would still reverse the district court's grant of summary judgment to the City because Measure B presents sufficient "danger signs" to warrant examining the record independently and carefully

to determine whether the contribution limits are narrowly tailored to match the City's interest, and Measure B's individual contribution limits do not survive that independent scrutiny.

## COUNSEL

Chad D. Morgan (argued), Law Office of Chad Morgan APC, Anaheim, California, for Plaintiff-Appellant.

Holly O. Whatley (argued) and Liliane M. Wyckoff, Colantuono Highsmith & Whatley PC, Pasadena, California, for Defendant-Appellee.

Dan Backer, Chalmers Adams Backer & Kaufman LLC, Fairfax, Virginia, for Amicus Curiae Coolidge-Reagan Foundation.

Owen D. Yeates, Institute for Free Speech, Washington, D.C., for Amicus Curiae Institute for Free Speech.

Krista MacNevin Jee, Jones Mayer, Fullerton, California, for Amicus Curiae City of West Covina.

# OPINION

KOH, Circuit Judge:

On March 3, 2020, 82% of the voters in the City of Oxnard (the "City") voted to approve a ballot measure known as the Oxnard Government Accountability and Ethics Act ("Measure B"). Measure B included, among other things, per candidate contribution limits and aggregate contribution limits for municipal elections. Plaintiff-Appellant Moving Oxnard Forward, Inc. ("MOF"), a political advocacy nonprofit organization, challenged the City's campaign contribution limits.[1]  MOF argued that the per candidate contribution limits violate the First Amendment and that the aggregate contribution limits violate the First and Fourteenth Amendments. The district court granted summary judgment in favor of the City and upheld both contribution limits. For the reasons stated below, we affirm.

## FACTUAL BACKGROUND

Measure B responded to the City's voters' demand for government accountability following the City's history of political scandals. For example, in July 2003, City Councilmember Andres Herrera took a trip to Cabo San Lucas, Mexico, on Oxnard businessman Bernard Huberman's private jet. In December 2005, Herrera took another trip to Cabo San Lucas on Huberman's private jet. A comparable round-trip flight on a private jet to Cabo San Lucas was estimated to cost $18,000. The day after Herrera

---

[1] MOF's suit is against Defendant-Appellee Lourdes Lopez, the City Clerk, in her official capacity. For simplicity, we refer to the Defendant-Appellee as "the City."

returned from the latter trip on Huberman's private jet, Herrera voted to approve the City's multimillion-dollar purchase of a building from a Huberman-affiliated company.

In 2006, Councilmember Herrera and City Public Works Director Ken Ortega attended a Los Angeles Lakers game as the guests of Jeff Savard, Vice President of Kennedy/Jenks Consultants, a local engineering and consulting firm doing significant business with the City.   Savard spent approximately $2,300 on the tickets to the Lakers game, limousine transportation to and from the game, refreshments during the game, and dinner afterward.  At the time, Ortega was in a position to approve, and did approve, contracts between the City and Kennedy/Jenks Consultants.

In June 2007, Mayor Tom Holden and his wife took a trip to Cabo San Lucas aboard Huberman's private jet and stayed at Huberman's Cabo San Lucas residence.  Holden had previously taken two trips to Cabo San Lucas aboard Huberman's private jet in December 1998 and December 2000 while serving as a City Councilmember.  When Holden took his third trip in 2007, the City was actively negotiating with a Huberman-affiliated company on a $13 million real estate transaction.  Additionally, in January 2009, Holden and his wife took a trip to Napa, California aboard Huberman's private jet, and Huberman paid for their hotel room.  Within three months of this Napa trip, a Huberman-affiliated company submitted a bid for a new contract with the City.  Holden, the ranking member of the task force assessing the bid, recommended the Huberman-affiliated company for the bid.  Taking the three trips to Cabo San Lucas and the one trip to Napa together, Huberman provided Holden with an estimated $58,000 worth of private jet travel, not including the private jet travel provided to Holden's wife.  Holden claimed that he provided fair value for these

travel expenses by providing optometry services worth "over $4,000" in value to Huberman's family.

In May 2010, a local newspaper, the Ventura County Star, reported on alleged corruption involving, among other things, City officials receiving gifts from companies doing business with the City without declaring the gifts as required by law.

The Ventura County District Attorney began an investigation into allegations of misappropriation of public funds, failure to disclose gifts as required by law, and possible conflicts of interest. Investigators executed more than 30 search warrants at more than 50 locations, including a public search of City Hall to recover documents, and interviewed dozens of individuals.

In 2012, the District Attorney published a lengthy report (the "Report") on the alleged corruption. Relevant to this appeal, the Report detailed numerous instances where City officials regularly received gifts from companies doing business with the City without declaring them. The Report found that "accepting gifts from companies doing business with the [City] was fairly common among some [City] officials." These gifts included, among other things: rounds of golf; meals; flights on private jets; and tickets to Los Angeles Lakers games, Los Angeles Dodgers games, and Broadway shows. The Report referred these issues to the California Fair Political Practices Commission for administrative enforcement.

Additionally, the Report noted that several individuals raised suspicions about Huberman's close relationship with City officials. On this topic, the Report found that Mayor Holden and Huberman were close friends, and that Holden repeatedly lied to investigators about the extent of his

relationship with Huberman and his travel expenses paid by Huberman.

Following the political scandal and fallout of the Report, the City in the fall of 2019 conducted a Resident Satisfaction and Communities Priority Survey (the "Survey") on several issues, including government accountability measures. The City commissioned the Survey "to continue to earn the community's trust and confidence" and worked "to overcome a decades-long record of mismanagement." Approximately 77% of surveyed residents favored a government accountability measure. In response to the Survey, and in light of the Report, the City stated that it "developed Measure B to address the public's stated desire to institutionalize good government practices."

Relevant to this appeal, Measure B established contribution limits for City Council elections:

> Contributions. No person shall make, and no candidate for elective office or campaign treasurer shall solicit or accept, any contribution which would cause the total amount contributed by that person to that candidate, including contributions or loans to all political committees or broad-based political committees controlled by the candidate and in-kind contributions, to exceed five hundred dollars ($500) for any election. No political action committee shall make, and no candidate for elective office, or campaign treasurer, shall solicit or accept any contribution which would cause the total amount contributed by that political action committee to that candidate, including

> contributions or loans to all political committees or broad-based political committees controlled by the candidate and in-kind contributions, to exceed one thousand dollars ($1,000) for any election. For purposes of Section 2-243 a "political action committee" shall mean any "general purpose committee" or "city general purpose committee" as those terms are defined by Government Code Section 82027.5. The limits set forth in this subsection shall be adjusted every two (2) years by resolution of the City Council pursuant to Section 2-245.[2]

Measure B also established higher contribution limits— $750 for individuals and $1,500 for political action committees—for citywide elections, such as for Mayor, City Clerk, and City Treasurer. Among the purposes provided by Measure B for the campaign contribution limits was "to deter corruption and the appearance of corruption caused by the coercive influence of large financial contributions on candidates' positions." Further, Measure B included a ban on elected City officials and members of the City's Planning Commission accepting gifts.

On October 15, 2019, the City Council adopted Resolution No. 15,271 to place Measure B on the ballot for the March 3, 2020 election. On March 3, 2020, 82% of the voters in the City approved Measure B. Measure B took effect on May 1, 2020.

---

[2] Measure B also established a $500 limit, adjusted for inflation every two years, for loans to candidates in all municipal elections.

## PROCEDURAL HISTORY

On May 5, 2020, MOF brought suit against Michelle Ascension in her official capacity as City Clerk and requested declaratory and injunctive relief. MOF brought three claims: (1) "[t]he per candidate contribution limits violate free speech and association"; (2) "[t]he aggregate contribution limits violates [sic] free speech, association, and equal protection"; and (3) "[t]he gift ban violates free speech and association." The parties filed cross-motions for summary judgment, and the district court held a hearing on both motions.

On August 5, 2021, the district court granted summary judgment in favor of the City and denied MOF's motion for summary judgment. The district court held that Measure B's per candidate contribution limits did not violate the First Amendment because the City had demonstrated a sufficiently important governmental interest and the contribution limits were closely drawn to that interest. As to Measure B's aggregate contribution limits, the district court found Measure B did not limit contributions made to a committee formed to support or oppose a ballot measure. Thus, the district court concluded that Measure B did not treat candidates who support or oppose ballot measures differently from other candidates or otherwise restrict candidates' ability to both run for office and campaign for or against a ballot measure. As to Measure B's gift ban, the district court held that the gift ban did not violate the First Amendment because it was "closely drawn to further the City's anticorruption interest."[3] MOF filed a timely appeal.

---

[3] On appeal, MOF does not challenge the district court's gift ban ruling.

### JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction under 28 U.S.C. § 1291. "We review the district court's decision on cross-motions for summary judgment de novo. Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law." *U.S. Sec. & Exch. Comm'n v. Feng*, 935 F.3d 721, 728 (9th Cir. 2019) (citations omitted). Cross-motions are considered separately, with the non-moving party in each instance being given "the benefit of all reasonable inferences." *Id.* (internal quotation marks and citation omitted). Where the parties agree no material facts are disputed, "we ask only whether the district court correctly applied the relevant substantive law." *BNSF Ry. Co. v. Or. Dep't of Revenue*, 965 F.3d 681, 685 (9th Cir. 2020) (internal quotation marks and citation omitted).

### ANALYSIS

This case concerns whether Measure B's campaign contribution limits, adopted and approved by 82% of the City's voters, are constitutional. MOF challenges both Measure B's per candidate contribution limits and its aggregate contribution limits. We address each in turn and hold that both are constitutional.

## I.  Per Candidate Contribution Limits

MOF alleges that Measure B's per candidate contribution limits are unconstitutional because the limits violate MOF's freedom of speech and association rights. We begin with a brief overview of the legal framework under the First Amendment for determining the constitutionality of contribution limits.

In *Buckley v. Valeo*, 424 U.S. 1 (1976), the U.S. Supreme Court recognized that contribution limits restrict free speech and association. *Id*. at 23. However, contribution limits, as opposed to spending limits, are "only a marginal restriction" on free speech and association and are therefore subject to a less rigorous standard of review than strict scrutiny. *Id*. at 20, 23; *see also Fed. Election Comm'n v. Beaumont*, 539 U.S. 146, 161 (2003) (holding that contribution limits are "subject to [a] relatively complaisant review under the First Amendment" as compared to spending limits). That is because a campaign contribution limit still "permits the symbolic expression of support evidenced by a contribution" and "does not in any way infringe the contributor's freedom to discuss candidates and issues." *Buckley*, 424 U.S. at 21. Thus, contribution limits are constitutional "as long as the Government demonstrates that the limits are closely drawn to match a sufficiently important interest." *Randall v. Sorrell*, 548 U.S. 230, 247 (2006) (plurality opinion) (internal quotation marks and citation omitted).

Under the U.S. Supreme Court's two-part test to determine whether campaign contribution limits pass First Amendment scrutiny, we first ask whether there is evidence of a sufficiently important governmental interest. *See Buckley*, 424 U.S. at 25. The Supreme Court has "identified only one legitimate governmental interest" in imposing a contribution limit: targeting "*quid pro quo* corruption or its appearance." *McCutcheon v. Fed. Election Comm'n*, 572 U.S. 185, 192, 206 (2014) (internal quotation marks and citation omitted). This includes targeting "large contributions that are given to secure a political *quid pro quo* from current and potential office holders," and "the appearance of corruption stemming from public awareness of the opportunities for abuse inherent in a regime of large

individual financial contributions to particular candidates." *Id*. at 207 (quoting *Buckley*, 424 U.S. at 26-27) (internal quotation marks and alteration omitted).

If the government establishes a sufficiently important interest in limiting campaign contributions, we then ask whether the contribution limits are closely drawn to the government's interest, because a contribution limit may still be "too low and too strict to survive First Amendment scrutiny." *Randall*, 548 U.S. at 248 (plurality opinion). Courts ordinarily "defer[] to the legislature's determination" of the contribution limit amount. *Id.* There is, however, a "lower bound" where "the constitutional risks to the democratic electoral process become too great" because the limits "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders." *Id.* at 248-49.

The U.S. Supreme Court has set forth four "danger signs" that the contribution limits may be unconstitutionally low. *Id*. at 249. If a danger sign is present, courts "must review the record independently and carefully" to determine whether the contribution limits are closely drawn to meet the government's interest. *Id*. To guide this independent and careful review, the Supreme Court has identified "five sets of considerations" to determine whether the contribution limits are appropriately tailored and not unconstitutionally restrictive. *Id.* at 261. This review ensures that contribution limits remain high enough to allow "candidates to raise the funds necessary to run a competitive election"; "political parties to help their candidates get elected"; and "individual citizens to volunteer their time to campaigns." *Id.* at 253; *see also Buckley*, 424 U.S. at 25 (requiring contribution limits to be "closely drawn to avoid unnecessary abridgment of associational freedoms").

Below we assess Measure B under this two-part test and conclude that the City has established a sufficiently important governmental interest in imposing contribution limits at step one. We then assess whether any danger signs are present under *Randall*. We assume that one danger sign is present and hold that Measure B's per candidate contribution limits are closely tailored to the City's interest.

## A.  The City's Interest

At step one, the City has established a sufficiently important governmental interest in preventing "*quid pro quo* corruption or its appearance." *McCutcheon*, 572 U.S. at 192 (internal quotation marks and citation omitted); *see also Buckley*, 424 U.S. at 28 (upholding a contribution limit because "the actuality and potential for corruption have been identified"). The U.S. Supreme Court has recognized that "the dangers of large, corrupt contributions and the suspicion that large contributions are corrupt are neither novel nor implausible." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391 (2000). Thus, the City need only demonstrate that the risk of quid pro quo corruption or its appearance is more than "mere conjecture," *id*. at 392, and not "illusory," *Buckley*, 424 U.S. at 27. The Supreme Court reiterated this standard in 2014 in *McCutcheon*. *See* 572 U.S. at 210 ("[W]e have never accepted mere conjecture as adequate to carry a First Amendment burden." (internal quotation marks and citation omitted)). We have explained that this is a "low [evidentiary] bar." *Lair v. Motl*, 873 F.3d 1170, 1172, 1178 (9th Cir. 2017).

The City's evidence is sufficient under *Nixon.* In *Nixon*, the U.S. Supreme Court held that Missouri had met its evidentiary obligation for its contribution limits based on the following evidence: (1) reports of scandals, including a state

representative being accused of kickbacks and a former attorney general having pled guilty to conspiracy to misuse state property; (2) the fact that 74% of voters voted yes on the statewide proposition establishing contribution limits; (3) an affidavit from a state senator stating that large contributions have the real potential to buy votes; and (4) newspaper reports of large contributions that supported inferences of impropriety, such as a state treasurer using a certain bank after that bank made a $20,000 contribution to him. *See* 528 U.S. at 393-94.

The City has met its evidentiary burden through four pieces of evidence detailed *supra*: (1) a newspaper article alleging corruption by City officials; (2) an investigation by the District Attorney, resulting in the Report detailing numerous instances of behaviors that gave rise to the appearance of quid pro quo corruption; (3) the Survey showing 77% of residents wanted a government accountability measure; and (4) the fact that 82% of the City's voters approved Measure B.

The newspaper article, investigation, and Report establish the appearance of quid pro quo corruption. The Report details numerous instances where City officials, such as Councilmember Herrera, Public Works Director Ortega, and Mayor Holden, received valuable travel accommodations or gifts from those who did business with the City. The Report also establishes that those officials took official actions that benefited those who provided the travel and gifts after receiving those travel accommodations and gifts. For example, City Councilmember Herrera voted to approve the City's multimillion-dollar purchase of a building from a company that was affiliated with Bernard Huberman the day after Herrera returned from a trip on Huberman's private jet. City Public Works Director Ortega

approved contracts between the City and Kennedy/Jenks Consultants during the period of time Ortega received tickets, transportation, and refreshments for a Lakers game from Kennedy/Jenks Consultants' Vice President. City Mayor Holden approved a bid that a Huberman-affiliated company made for a City contract three months after Mayor Holden and his wife took a trip to Napa on Huberman's private jet and Huberman paid for their hotel room.

The fact that these officials received valuable benefits and subsequently took official actions that benefited those who provided the benefits establishes the appearance of quid pro quo corruption. The U.S. Supreme Court has said that "*quid pro quo*" corruption involves "a specific intent to give or receive something of value in exchange for an official act." *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404-05 (1999) (emphasis omitted). Thus, there is quid pro quo corruption when "any payment or property [is] received" in return for "a promise of official action or inaction." *McCormick v. United States*, 500 U.S. 257, 266 (1991). There is no doubt that the Report documents, at the very least, the *appearance* of exchanges of "property" in return for "official action or inaction." *Id.*

It is no matter that the Report concluded that there was insufficient evidence to warrant criminal prosecution. *Buckley* makes clear that campaign contribution limits may be appropriate even if criminal penalties exist precisely because "laws making criminal the giving and taking of bribes deal with only the most blatant and specific attempts" at corruption. 424 U.S. at 27-28. Such laws, necessarily, are only a "partial measure" that do not address the *appearance* of corruption. *Id.* at 28.

Nor does it matter that the Report was published almost eight years before Measure B.  We have previously considered evidence under a lengthier timeframe in *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085 (9th Cir. 2003).  In *Eddleman*, we considered a 13-year-old letter and a 12-year-old statewide poll as evidence that Montana had proven a sufficiently important governmental interest in imposing contribution limits. *See id.* at 1093.  And in this case, the City provided additional evidence that the Report played a prominent role in the debates on Measure B in the lead up to the March 3, 2020 election, which establishes that the Report was part of the public information readily available to the voters who approved Measure B.

The Survey and subsequent 82% approval of Measure B by the City's voters establishes that the voters believed it was necessary to combat quid pro quo corruption or its appearance through contribution limits.  In *Nixon*, the government relied on the fact that 74% of voters voted yes on a statewide proposition establishing contribution limits to "attest[] to the perception" that voters "determined that contribution limits are necessary to combat corruption and the appearance thereof."  528 U.S. at 394 (internal quotation marks and citation omitted).  Similarly, here, Measure B's vote tally attests that voters believed that contribution limits were necessary to combat corruption or its appearance.

The City also provides Survey results, which were not available in *Nixon*, and these results similarly support the perception that contribution limits were necessary.  That is so even though Measure B included additional issues beyond contribution limits and the Survey addressed government accountability generally rather than corruption from campaign contribution limits alone.  The U.S. Supreme Court has never required that voters must specifically attest

to their interest in campaign contribution limits *alone* to establish that there is an appearance of quid pro quo corruption and that voters believe contribution limits are necessary to address such corruption. Thus, the City establishes that there was a "perception" that voters believed a campaign contribution limit was necessary, even though Measure B is not identical to the statewide proposition that contained a contribution limit in *Nixon*.[4]

MOF did not put forth its own evidence rebutting the City's evidence. If MOF had presented evidence to cast doubt on the implications of the City's evidence, then "[t]here might, of course, be need for a more extensive evidentiary documentation." *Id.* However, MOF designated two expert witnesses on this issue but ultimately withdrew their designations prior to the production of any expert reports.

Of course, the City's evidence in this case is not identical to the evidence the government provided in *Nixon*. No two

---

[4] There is no merit to MOF's suggestion that we may not rely upon evidence of public approval through the Survey and Measure B's vote tally to establish a legitimate government interest because doing so contravenes the First Amendment's protections for minority viewpoints. The U.S. Supreme Court has implicitly held that it is appropriate to consider such evidence because the Court relied upon similar evidence of public perception in *Nixon*. *See* 528 U.S. at 394. In *Nixon*, when considering the evidence presented by Missouri to prove its governmental interest, the Court stated that "although majority votes do not, as such, defeat First Amendment protections, the statewide vote on Proposition A certainly attested to the perception relied upon here: 'An overwhelming 74 percent of the voters of Missouri determined that contribution limits are necessary to combat corruption and the appearance thereof.'" *Id.* (citation and alteration omitted); *see also Eddleman*, 343 F.3d at 1093 (considering a statewide poll offered by Montana as evidence of Montana's sufficient governmental interest).

cases are alike.  The *Nixon* Court, however, concluded that it was not "a close call" that Missouri had met its evidentiary burden.  *Id*. at 393.  We conclude that, as in *Nixon*, the City offered more than enough evidence to demonstrate its interest in preventing actual or perceived quid pro quo corruption.

**B.  Closely Drawn**

As the City has satisfied its burden at step one, the second step is to determine whether the chosen contribution limits are closely drawn to the City's interest in preventing quid pro quo corruption or its appearance.  As discussed, we first inspect whether any of the four danger signs that the contribution limits are so low as to "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders" are present. *Randall*, 548 U.S. at 249 (plurality opinion).  If a danger sign is present, we then "review the record independently and carefully" through five sets of considerations to determine whether the contribution limits are appropriately tailored and not unconstitutionally restrictive.  *Id.*  In this case, we assume without deciding that one danger sign is present and conclude that Measure B's limits are nonetheless appropriately tailored to the City's interest.

**1.  Danger Signs**

The U.S. Supreme Court has identified four "danger signs" to assess whether contribution limits pose threats to the electoral process, *id*., addressing whether: "(1) [t]he limits are set per election cycle, rather than divided between primary and general elections; (2) the limits apply to contributions from political parties; (3) the limits are the lowest in the Nation; and (4) the limits are below those we

have previously upheld," *id.* at 268 (Thomas, J., concurring in the judgment) (listing the plurality's "danger signs").

Here, the first three *Randall* danger signs are not present. First, Measure B's per candidate contribution limits are per candidate per election, not per office per election cycle. Second, higher limits apply to contributions from political action committees, and no contribution limits apply to political parties. Third, the contribution limits are comparable to contribution limits imposed by other California cities of comparable size. The City's expert report concluded that "[a]t both the citywide and district levels, the new campaign contribution limits in Oxnard very nearly match the median levels that are typical in other cities. This is true looking at the absolute dollar value of the limits as well as their levels *per voter* and *per resident*." MOF concedes that, under the City's expert's analysis, the City's contribution limits are in the middle of cities with comparable populations.

Specifically, the City's expert report compared Measure B's contribution limits to the contribution limits of California cities with comparable populations between 100,000 and 300,000 residents. The City's estimated population is 208,881. The City's contribution limit for citywide offices was near the median of comparable cities in all respects. The median limit per absolute dollar amount was $720, and the City's was $750. The median limit per resident was $0.0048, and the City's was $0.0036. The median limit per registered voter was $0.0083, and the City's was $0.0081.

For further comparison, the City's contribution limit for citywide offices is greater than the limits for similarly sized

cities, such as Irvine, Huntington Beach, and Fremont, on an absolute dollar, per resident, and per registered voter basis.

The City's expert also compared Measure B's contribution limits to the limits of larger cities with populations above 300,000. The expert concluded that the City's citywide contribution limit is also greater than the limits for much larger cities such as San Francisco and Oakland, on an absolute dollar, per resident, and per registered voter basis. Further, on a per resident and per registered voter basis, the City's limit is over nine times greater than Los Angeles's limit, four times greater than San Diego's limit, and three times greater than San Jose's limit. Los Angeles, San Diego, and San Jose also have populations over 300,000.

Similarly, the City's contribution limit for district-wide offices was near the median of comparable cities in all respects. The median limit per absolute dollar amount was $515, and the City's was $500. The median limit per district resident was $0.0225, and the City's was $0.0144. The median limit per district registered voter was $0.0416, and the City's was $0.0325.

For further comparison, the City's contribution limit for district-wide offices is the same or greater than the limits for much larger cities with populations above 300,000, such as San Francisco and Oakland, on an absolute dollar, per resident, and per registered voter basis. Additionally, on a per resident and per registered voter basis, the City's limit is over four times greater than Los Angeles's limit, three times greater than San Diego's limit, and two times greater than San Jose's limit.

To rebut the City's expert, MOF argues that the City's expert's analysis is flawed because the dataset should have

included comparably sized cities that have not imposed any contribution limits. MOF's argument is unavailing. MOF cites no authority for the proposition that cities without a contribution limit should be considered, and the U.S. Supreme Court has implicitly rejected MOF's approach. In *Randall*, the Court only compared Vermont's contribution limits to other contribution limits imposed by states across the country and did not consider states without a contribution limit. *See id.* at 250-51 (plurality opinion).

MOF's argument is also logically unsound. MOF claims that cities that have not imposed a contribution limit must be included. In doing so, MOF assumes that all of these cities could have imposed a contribution limit but have declined to do so. However, MOF does not account for the fact that these cities may not have evidence of actual or apparent quid pro quo corruption necessary to implement a contribution limit. In evaluating whether the City's chosen contribution limit is appropriate, it makes little sense to compare the City's limit to cities that constitutionally may not be allowed to enact a contribution limit. Thus, the third *Randall* danger sign is not present.

The final *Randall* danger sign is whether the contribution limit is below "the contribution limits upheld by the Court in the past." *Id*. at 249. We assume without deciding that this danger sign is present. MOF argues that this danger sign only permits us to assess the contribution limit in comparison with those that have been upheld by the U.S. Supreme Court. According to MOF, this danger sign is present because the Supreme Court held that a comparable $500 contribution limit qualified as a danger sign in *Thompson v. Hebdon*, 589 U.S. 1, 5 (2019) (per curiam). However, limits appropriate for a statewide election may not be comparable to limits appropriate for an election in a city

with a population size of 208,881.  *Cf. Nixon*, 528 U.S. at 382 (holding that *Buckley*, which evaluated contribution limits for federal elected positions, was "authority for comparable state regulation, which need not be pegged to *Buckley*'s dollars").   The Supreme Court has never addressed whether a city's contribution limits are closely drawn.

The City thus asks us to consider comparable city-level contribution limits that have been upheld by lower courts. MOF's challenge would likely fail were we to consider limits upheld by other courts, including our sister circuits. On remand from the U.S. Supreme Court in *Nixon*, the Eighth Circuit upheld a limit of "\$275 for candidates for state representative or for any office where the population of the electoral district is less than 100,000." *Shrink Mo. Gov't PAC v. Adams*, 204 F.3d 838, 840 (8th Cir. 2000).  That limit is near the City's limit in today's dollars, and the City's districts have on average approximately one-third the population considered in *Shrink v. Adams*.  Other circuits have upheld similar limits.  *See, e.g.*, *Zimmerman v. City of Austin*, 881 F.3d 378, 387-88 (5th Cir. 2018) (upholding a \$350 base contribution limit); *Frank v. City of Akron*, 290 F.3d 813, 818 (6th Cir. 2002) (upholding a contribution limit of \$100 for ward council members and \$300 for at large city council members); *McNeilly v. Land*, 684 F.3d 611, 612 (6th Cir. 2012) (affirming the denial of a preliminary injunction as to a contribution limit of \$500 for candidates for state or local office in districts with a population of less than 85,000, and \$1,000 for candidates in districts with a population between 85,000 and 250,000).  Accordingly, the City's limit is comparable to limits previously upheld by other appellate courts.

However, we need not decide in this case whether we may consider limits upheld by lower courts to assess whether the final *Randall* danger sign is present. As explained below, even assuming this final *Randall* danger sign is met, such that we must review the record independently, we find Measure B's per candidate contribution limits are closely drawn to the City's legitimate interests in avoiding quid pro quo corruption or its appearance. *See Randall*, 548 U.S. at 253 (plurality opinion).

## 2. Independent Assessment

For our independent examination of the record, we look to "'five sets of considerations' to determine whether the statute was closely drawn." *Lair*, 873 F.3d at 1186 (citation omitted). The five considerations are: "(1) [W]hether the 'contribution limits will significantly restrict the amount of funding available for challengers to run competitive campaigns'; (2) whether 'political parties [must] abide by *exactly* the same low contribution limits that apply to other contributors'; (3) whether 'volunteer services' are considered contributions that would count toward the limit; (4) whether the 'contribution limits are . . . adjusted for inflation'; and (5) 'any special justification that might warrant a contribution limit so low or so restrictive.'" *Id*. (alteration in original) (quoting *Randall*, 548 U.S. at 253-62 (plurality opinion)). We do so to ensure that the contribution limits do not impose "substantial restrictions on the ability of candidates to raise the funds necessary to run a competitive election, on the ability of political parties to help get their candidates elected, and on the ability of individual citizens to volunteer their time to campaigns." *Randall*, 548 U.S. at 253 (plurality opinion). We examine each in turn.

First, the per candidate contribution limits will not significantly restrict the amount of funding available for challengers to run competitive campaigns. The City's expert concluded that Measure B's contribution limits would not have a significant effect on restricting campaign contributions. To do so, the City's expert analyzed the effect of Measure B's contribution limits on the City's 2018 election, when there were no limits on contributions. The City's expert found that "[f]or nearly all candidates, the proportions of their contributions that exceeded the limits were quite small." Specifically, the City's expert found that "only 18 of the 287 donors (6.3% of the donors) to Oxnard city candidates in 2018 made contributions that would have exceeded the limits in Measure B." Thus, 93.7% of donors made contributions below Measure B's limits in 2018.

Similarly, in *Nixon*, the U.S. Supreme Court found no indication that Missouri's contribution limits would prevent candidates from amassing the resources necessary for effective advocacy in part because of the "evidence that in the 1994 Missouri elections (before any relevant state limitations went into effect), 97.62 percent of all contributors to candidates for state auditor made contributions" below the limit. 528 U.S. at 396.

Moreover, only two of twelve candidates in 2018 raised the majority of their funds from contributions that would have exceeded Measure B's limits. Aaron Starr had three of his five donors give in amounts over the contribution limits, with $4,750 of his $8,250 raised above the limits. Additionally, Kari Cryder had two of her three donors give in amounts over the limits, with $2,000 of her $3,300 raised above the limits. In *Nixon*, the U.S. Supreme Court found that "a showing of one affected individual does not point up a system of suppressed political advocacy that would be

unconstitutional under *Buckley*." *Id*. Thus, even if we assume that Measure B's contribution limits would significantly restrict Starr's and Cryder's ability to run a competitive campaign, two affected individuals are likely insufficient to prove that Measure B's contribution limits systematically stymie competitive challengers.[5]

Starr's testimony "that the $500 limit made it impossible to fund a competitive campaign" does not challenge this conclusion. His own testimony belies his claim. Starr declared that "it would have been impossible . . . to raise sufficient funds to wage a competitive campaign with Measure B's $500 limit" because his fundraising strategy prioritized large donations from a small number of donors. Starr testified that he did not "pursu[e] donors as much because it's a lot of time to consume to get money at [$]200, [$]300, $400 a crack," and "you have to spend your time efficiently on a campaign." Starr further declared that, in his opinion, "there was little point in expending the effort to raise money in such small increments." As a result, Starr estimated that he had spent "not a whole lot more" than ten hours total fundraising in 2020. Starr declared that with Measure B in place, he "would have to spend all [his] time fundraising rather than campaigning such that the funds would have been meaningless because [he] would not have

---

[5] We take judicial notice that Starr was in fact elected to the City Council in 2024 while Measure B was in effect. *See* Ventura County Clerk-Recorder & Registrar of Voters, *November 5, 2024 Presidential General Election Results, Oxnard City Council District 3* (Mar. 4, 2025), https://perma.cc/SA3W-HM84 (reporting Starr's victory over Madrigal in the 2024 election); *United States v. Ritchie*, 342 F.3d 903, 909 (9th Cir. 2003) ("Courts may take judicial notice of some public records, including the records and reports of administrative bodies." (internal quotation marks and citation omitted)).

had time to do anything with them." Starr's testimony thus primarily reflects his personal belief as to the value of raising small contributions and the effect of Measure B on his personal fundraising strategy, not that Measure B "harm[s] the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Randall*, 548 U.S. at 249 (plurality opinion). All contribution limits will necessarily have a disproportionate effect on candidates who rely on large donations. But a limit that requires a candidate to "raise funds from a greater number of persons" instead of seeking "fewer, larger contributions" as the candidate "prefer[s]" does not "impugn[]" "the candidate's freedom of speech." *Lair*, 873 F.3d at 1186 (citation omitted). Thus, we hold that this consideration weighs in favor of Measure B.

Second, Measure B does not limit political party contributions, as MOF concedes. Measure B only limits contributions made by a "person" or a "political action committee," not a political party. Thus, we hold that this consideration weighs in favor of Measure B.

Third, Measure B's "treatment of volunteer services" is distinguishable from *Randall*. *See* 548 U.S. at 259 (plurality opinion). In *Randall*, the Court found Vermont's treatment of volunteer services troubling because Vermont's contribution limits did "not exclude the expenses those volunteers incur, such as travel expenses, in the course of campaign activities," and therefore unduly burdened volunteers' right to associate in a political party. *Id*.

MOF concedes that Measure B exempts a volunteer's travel expenses from the contribution limits. Further, Measure B excludes volunteer expenses associated with the

use of a volunteer's home, so long as the volunteer is not a lobbyist.  *See* Cal. Gov't Code § 82015(b)(5), (c)(2). Measure B also excludes volunteer expenses up to $500 related to meetings or fundraising events held at the volunteer's home or office.  *See id.* § 82015(c)(2).  MOF is therefore incorrect that Measure B would require meticulous tracking of expenses involved with the use of a volunteer's home along with providing snacks and beverages for neighbors to meet a candidate.  Thus, we hold that this consideration weighs in favor of Measure B.

Fourth, Measure B's limits are adjusted for inflation. MOF concedes this point.  Measure B provides that the contribution limits for district-wide and citywide offices "*shall* be adjusted every two (2) years by resolution of the City Council pursuant to Section 2-245."  Section 2-245 further provides that "[t]he campaign contribution limits and loan limits . . . *shall* be adjusted by the City in February at two year intervals beginning in 2023 to reflect annual changes in the Consumer Price Index (CPI) over the previous two-year period."  Here, the City Clerk automatically calculates adjustments every two years and the City has conceded that Measure B imposes a "ministerial" duty upon the City to adjust the limits for inflation.  The City would be subject to a writ of mandamus that requires the City to adjust the limits if it attempted to avoid doing so.  *See Moving Oxnard Forward, Inc. v. Ascension*, 124 F.4th 605, 629 n.14 (9th Cir. 2024) (Bennett, J., dissenting) ("A traditional writ of mandate under [California] Code of Civil Procedure section 1085 is a method for compelling a City to perform a legal, usually ministerial duty." (quoting *Indep. Living Ctr. of S. Cal., Inc. v. Kent*, 909 F.3d 272, 280 n.1 (9th Cir. 2018))), *reh'g en banc granted, vacated sub nom.*, *Moving Oxnard Forward, Inc. v. Lopez*, 138 F.4th 1102 (9th

Cir. 2025).   Thus, this consideration weighs in favor of
Measure B.[6]

As the first four factors weigh in the City's favor, the
City does not need a special justification for Measure B's
individual contribution limit.  In *Randall*, the U.S. Supreme
Court only considered Vermont's lack of a special
justification after the Court evaluated the first four
considerations and concluded that Vermont's contribution
limits unduly "burden[] First Amendment interests."  548
U.S. at 261 (plurality opinion).   Given that the first four
considerations already cut against Vermont's contribution
limits, the Court found it problematic that there was
"nowhere in the record any special justification that might
warrant a contribution limit so low or so restrictive as to
bring about the serious associational and expressive
problems" that it had described.   *Id*.   Here, based on the
danger signs and first four factors, there are no "serious
associational and expressive problems" arising from

---

[6] Although MOF concedes this point, the dissent would still hold that
Measure B's limits are not adjusted for inflation.  The dissent believes
there is "insufficient assurance that the limits will be raised" with
inflation because the adjustments require the City Council to "review and
adopt these changes."  Dissent at 75-76.  The dissent's approach is not
supported by law.   Both the *Randall* plurality and courts applying
*Randall* have treated this fourth factor as presenting a danger sign where
the disputed measure failed to make any reference to inflation.  *See
Randall*, 548 U.S. at 238 (plurality opinion); *Thompson*, 589 U.S. at 6.
*Randall* was specifically concerned that the burden of updating
contribution limits would be placed on "incumbent legislators who may
not diligently police the need for changes in limit levels to ensure the
adequate financing of electoral challenges."  548 U.S. at 261 (plurality
opinion).  However, as explained above, Measure B explicitly requires
the City Clerk to adjust the contribution limits for inflation every two
years, and the City is mandated to adopt the adjusted contribution limits
under state law.

Measure B's individual contribution limits, and thus a special justification is unnecessary. *Id*.

Taken together, four considerations—the ability of challengers to run competitive campaigns, the limits on political party contributions, treatment of volunteer services, and adjusting the contribution limits for inflation—favor Measure B.  The final consideration, the presence of a special justification, is irrelevant.  Thus, we conclude that Measure B's per candidate contribution limits are closely drawn to the City's interest in preventing actual or apparent quid pro quo corruption.

## C.  Dissent

The dissent would take an entirely different approach at each step of the above analysis than the approach authorized by the U.S. Supreme Court.  At step one, the dissent radically departs from Supreme Court precedent and would require evidence of actual quid pro quo corruption.  At step two, the dissent invents a new danger sign completely unmoored from *Randall* and Supreme Court precedent and engages in a wholly unprecedented tailoring analysis.  We address each of the dissent's errors in turn.

### 1.  The City's Interest

At the first step, the dissent contends that the U.S. Supreme Court overruled *Lair* and *Eddleman* in *Citizens United* and *McCutcheon* and suggests that we must now require the government to produce evidence of actual instances of quid pro quo corruption to establish an interest in preventing such corruption or its appearance.  *See* Dissent at 53-56; *Citizens United v. Fed. Election Comm'n*, 558 U.S.

310, 357 (2010).[7]   That is not the case.   Instead, *Citizens United* and *McCutcheon* merely clarified that the government "may not seek to limit the appearance of mere influence or access" in imposing contribution limits because quid pro quo corruption does not encompass mere influence or access.  *McCutcheon*, 572 U.S. at 208 (citing *Citizens United*, 558 U.S. at 360).

Indeed, it would be inconsistent with U.S. Supreme Court precedent to require the government to produce evidence of actual instances of quid pro quo corruption to demonstrate an interest in preventing such corruption or its appearance.   The Court has recognized that "few if any contributions to candidates will involve *quid pro quo* arrangements," *Citizens United*, 558 U.S. at 357, and "the scope of such pernicious practices can never be reliably ascertained," *Buckley*, 424 U.S. at 27.   That is why "restrictions on direct contributions are preventative." *Citizens United*, 558 U.S. at 357.  Additionally, *McCutcheon* reaffirmed the requirement that the government must demonstrate that its interest in preventing quid pro quo corruption or its appearance is more than conjectural.  *See* 572 U.S. at 210 (stating that "we have never accepted mere conjecture as adequate" (internal quotation marks and citation omitted)).  The Supreme Court also acknowledged and declined to overrule our circuit's articulation of the state's evidentiary burden in *Thompson*.   589 U.S. at 3.

---

[7] The dissent's author authored the vacated panel majority opinion, which assumed without deciding that Measure B's individual contribution limits "further the important state interest of preventing quid pro quo corruption or its appearance."  *Moving Oxnard Forward*, 124 F.4th at 614.

Therefore, we see no reason to revisit our holdings in *Lair* and *Eddleman*.

## 2. Closely Drawn

At the second step in the analysis, the dissent invents a new *Randall* danger sign out of whole cloth: the City Council's alleged improper motive to adopt Measure B to punish MOF President Aaron Starr, a frequent challenger of the City Council and one of the candidates most affected by Measure B's contribution limits. *See* Dissent at 64-67, 71. Concluding that this new danger sign is present, the dissent then holds that Measure B is not closely tailored to the City's interest in preventing quid pro quo corruption or its appearance by taking a novel comparative approach unmoored from precedent.

### i. Danger Signs

The dissent errs in three ways in its danger sign analysis. The dissent conducts an inappropriate inquiry into legislative motive to determine whether facially neutral contribution limits are lawful; invents a new danger sign that contravenes *Randall* to do so; and inappropriately imports law from the Equal Protection and First Amendment viewpoint discrimination contexts to allow parties to succeed on a claim challenging contribution limits.

To begin, even assuming that invidious discrimination is a danger sign under *Randall*, the dissent's inquiry into the City Council's legislative motive is wholly inappropriate in this case because the contribution limits were not adopted by the City Council, but instead by the City's voters. If any motive was relevant here, it would be the motive of the voters, not the City Council. The dissent points to nothing to suggest that the City's voters had any alleged improper

motives in enacting facially neutral contribution limits, and we decline to attribute the City Council's alleged discriminatory motives to the voters. *See Boardman v. Inslee*, 978 F.3d 1092, 1119 (9th Cir. 2020) (declining to attribute the intent of a union that supported a ballot measure to "the more than 2.2 million Washington voters who voted in favor of [the initiative]" (emphasis omitted)). MOF concedes that Measure B is facially neutral.

Furthermore, "[i]t is a familiar principle of constitutional law that this Court will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive." *United States v. O'Brien*, 391 U.S. 367, 383 (1968). The U.S. Supreme Court "has long disfavored arguments based on alleged legislative motives," out of recognition that "inquiries into legislative motives 'are a hazardous matter.'" *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215, 253 (2022) (quoting *O'Brien*, 391 U.S. at 383) (collecting cases). We therefore resort to such examinations only when absolutely necessary—in the "very limited and well-defined class of cases where the very nature of the constitutional question *requires* an inquiry into legislative purpose." *O'Brien*, 391 U.S. at 383 & n.30 (emphasis added). That class includes cases involving bills of attainder, *id.* at 383 n.30, and race-based motives, *City of Columbia v. Omni Outdoor Advert., Inc.*, 499 U.S. 365, 377 n.6 (1991), neither of which is at issue here. Beyond those two contexts, the "stakes are sufficiently high for [courts] to eschew guesswork" when possible. *O'Brien*, 391 U.S. at 384.

Moreover, "[e]ven when an argument about legislative motive is backed by statements made by legislators who voted for a law," we should be "reluctant to attribute those motives to the legislative body as a whole," since "[w]hat

motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it." *Dobbs*, 597 U.S. at 253-54 (quoting *O'Brien*, 391 U.S. at 384). That is exactly the case here. The dissent primarily points to two pieces of evidence to show alleged discriminatory motive. First, the City's unelected City Manager created a PowerPoint presentation that does not name Starr. However, two slides of the PowerPoint presentation highlight contributions that one candidate raised. The PowerPoint presentation included other illustrative evidence supporting Measure B, such as California state legislative findings that "massive contributions" to "candidates for local office from donors with business before that local government . . . create a serious risk of actual or perceived corruption." Second, the City did "not directly deny" that Starr's fundraising practices were a "factor" in the City Council's proposal of Measure B. Dissent at 67-69. However, the dissent points to nothing to indicate that any members of the City Council or any voters were motivated to target Starr.

Second, the dissent's newly invented danger sign contravenes *Randall*. We note that the dissent points to no other circuit court decision that has invented a new danger sign.

Although it is true that *Randall* does not require lower courts to consider only the four danger signs it lists, and it is possible that there may be other signs of "constitutional risk[] to the democratic electoral process," the dissent's approach is inconsistent with *Randall*. 548 U.S. at 248 (plurality opinion). *Randall* was specifically concerned about the risk that low contribution limits may "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders." *Id.* at

249.  The dissent concedes that "Starr was the person who would most be affected by Measure B's passage and that few others would be significantly impacted" and does not explain how Measure B prevents challengers in general from running effective campaigns.  Dissent at 67.  And as discussed above, the evidence does not establish that Measure B's campaign contribution limits even affected Starr's ability to run a competitive campaign.

The dissent's concern about alleged discriminatory motives from the City Council bears no connection to *Randall*'s goal of ensuring that contribution limits do not prevent incumbents from facing adequate electoral challenges.  Because the U.S. Supreme Court has previously admonished this Circuit to treat *Randall*, including its danger signs, as precedent, and because the dissent's newly invented danger sign is inconsistent with *Randall*, we decline to adopt it.  *See Thompson*, 589 U.S. at 4 n.\*, 5-6.

Finally, the dissent improperly imports inapposite case law from the Equal Protection Clause of the Fourteenth Amendment and viewpoint discrimination claims under the First Amendment to justify an expansion of *Randall*.

Importantly, MOF, as "the master of the complaint," did not challenge the per candidate contribution limit by raising an equal protection claim under the Fourteenth Amendment or a viewpoint discrimination or retaliation claim under the First Amendment, or by raising any other claim based on alleged discrimination from the City Council.  *Royal Canin U. S. A., Inc. v. Wullschleger*, 604 U.S. 22, 35 (2025) (citation omitted).  Instead, MOF alleged only that the per candidate contribution limits violated the First Amendment because they were not closely drawn to a sufficiently important state interest.  Therefore, although the City

Council's allegedly improper motives might be relevant in other contexts, we should not address claims that the parties did not raise or brief.  *See Ker v. California*, 374 U.S. 23, 43 (1963) ("Ordinarily we do not reach for constitutional questions not raised by the parties." (internal quotation marks and citation omitted)).

Even if MOF had asked us to do so, it is inappropriate to apply law that governs the Equal Protection Clause to the danger sign analysis under *Randall*.   The dissent cites *Buckley* for the proposition that it is appropriate to consider the legislature's motives to assess whether a campaign contribution limit presents a "danger sign" under *Randall*. Dissent at 63-64.  However, *Buckley* explicitly noted that campaign contributions could potentially "work invidious discrimination" in violation of the Equal Protection Clause, "*[a]part* from . . . First Amendment concerns." *See* 424 U.S. at 30, 97 (emphasis added).  As discussed, MOF never challenged the constitutionality of the per candidate contribution limits under the Equal Protection Clause.

Additionally, *Buckley* was also concerned about "invidious discrimination against challengers *as a class*." 424 U.S. at 31 (emphasis added).  For the court to determine that a contribution limit poses such a risk of invidious discrimination, we must conclude that the limit "w[ould] have a serious effect on the initiation and scope of minor-party and independent candidacies," *id.* at 34, and not merely that the limit "prevent[s]" a minor-party challenger "from receiving and spending as much money as the major parties," *Nat'l Comm. of the Reform Party of the U.S. v. Democratic Nat'l Comm.*, 168 F.3d 360, 366 (9th Cir. 1999).  The dissent instead focuses on evidence about Measure B's impacts on Starr alone.  It cites unnamed references to Starr in materials advocating for Measure B.  *See* Dissent at 65-67.  It focuses

on the relative impact of Measure B on Starr.  *See* Dissent at 67-68.   Finally, it notes the "considerable history of antipathy" between Starr and the City.  Dissent at 68.  The dissent also concedes that "Starr was the person who would be most affected by Measure B's passage and that few others would be significantly impacted" and that Measure B would have "minimal, if any, effect" on other politicians.  Dissent at 67, 75.  Thus, the dissent's proposed analysis would allow judges to strike down statutes on the basis of supposed invidious discrimination against one person in violation of the Equal Protection Clause without demonstrating that there is any discrimination against a class.  There is no indication in *Randall* or any other U.S. Supreme Court case suggesting that is the law.

The dissent also cites *Metro Display* for the proposition that "it is well settled that 'invidious' discrimination includes 'an effort to suppress the speaker's activity due to disagreement with the speaker's view.'"   Dissent at 69 (quoting *Metro Display Advert., Inc. v. City of Victorville*, 143 F.3d 1191, 1194 (9th Cir. 1998)).  But *Metro Display* did not involve campaign contribution limits or associational rights under the First Amendment at all, and instead concerned "'invidious' restraints" on speech.  143 F.3d at 1194.   As discussed, the Supreme Court has held that contribution limits, unlike expenditure limits, largely do not implicate restraints on speech.  *See Buckley*, 424 U.S. at 21 ("A [contribution] limitation . . . involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.").  Given that MOF could have raised a challenge based on alleged viewpoint

discrimination but declined to do so, we also see no reason to invent a novel way to decide such a claim under *Randall*.

### ii. Independent Assessment

Finally, after concluding that its newly invented danger sign triggers an independent review of the record to assess whether Measure B is properly tailored, the dissent would again depart from *Randall*. Instead of assessing whether Measure B is properly tailored to addressing the City's interest in preventing quid pro quo corruption or its appearance, the dissent would take a *comparative* approach that has no basis in *Randall*. It would assess whether Measure B is "more 'closely drawn' to fit (1) the City's asserted legitimate interest in avoiding actual or apparent quid pro quo corruption or (2) an alleged prohibited objective of squelching the political activities of Starr and others like him." Dissent at 71.

The dissent provides no Supreme Court case or any other authority to support its novel comparative approach. This approach is inconsistent with *Randall*, which requires this court to assess whether contribution limits are sufficiently "closely drawn" to meet the permissible objective of combating the existence or appearance of quid pro quo corruption. 548 U.S. at 247 (plurality opinion) (quoting *Buckley*, 424 U.S. at 25). *Randall* did not provide us with license to consider whether contribution limits were more closely aligned with any other possible government interest. Rather, *Randall* sought to ensure that contribution limits were closely drawn to combat quid pro quo corruption or its appearance by confirming that the limits are not so low as to fail to allow "candidates to raise the funds necessary to run a competitive election"; "political parties to help their candidates get elected"; and "individual citizens to volunteer

their time to campaigns." *Id.* at 253; *see also Buckley*, 424 U.S. at 25 (requiring contribution limits to be "closely drawn to avoid unnecessary abridgment of associational freedoms"). The dissent departs from *Randall* in an unprecedented way without any supporting authority.

Additionally, as explained above, we decline to consider the alleged invidious intent of the City Council in the first place because there is no evidence that it is relevant to the voters who approved Measure B.

## II.  Aggregate Contribution Limits

MOF also alleges that Measure B creates unconstitutional aggregate limits on contributions made to a candidate and to ballot measure campaigns that a candidate controls. Specifically, MOF claims that under Measure B, a City Council candidate who also sponsors a committee for a ballot measure could raise only $500 from a donor that may want to contribute to both the candidate's campaign and the candidate's ballot measure's campaign, whereas a non-candidate who sponsors a ballot measure would not face any such contribution limits. In this way, MOF argues that Measure B improperly discriminates against candidates who are also ballot measure proponents, in violation of the Fourteenth Amendment, and that the aggregate limits do not further a sufficient state interest and are not closely drawn, in violation of the First Amendment.

Contrary to MOF's understanding, the plain text of Measure B's contribution limits does not apply to ballot measure committees. Measure B provides, in relevant part: "No person shall make, and no candidate for elective office or campaign treasurer shall solicit or accept, any contribution which would cause the total amount contributed by that person to that candidate, including contributions or

loans to all political committees or broad-based political committees controlled by the candidate and in-kind contributions, to exceed five hundred dollars ($500) for any election."

MOF's challenge is based on the portion of Measure B that applies the contribution limits "to all political committees or broad-based political committees controlled by the candidate." In context, Measure B makes clear that its contribution limits apply to contributions made "*to that candidate.*" Thus, "political committees controlled by the candidate" is an explanatory phrase that cannot expand Measure B's limits to apply to contributions that are not made "to that candidate," such as contributions made for a ballot measure campaign. Measure B's language is akin to a "base limit." *McCutcheon*, 572 U.S. at 192. Base limits "restrict how much money a donor may contribute to any particular candidate," including "contributions that are in any way earmarked or otherwise directed through an intermediary or conduit to a candidate." *Id*. at 194 (internal quotation marks omitted). Base limits have been "previously upheld as serving the permissible objective of combatting corruption." *Id*. at 192-93.

Our understanding of Measure B is confirmed by the City Attorney. Prior to Measure B's enactment, the City Attorney provided an impartial analysis of Measure B. Relevant to this appeal, the City Attorney found that "[c]onsistent with existing case law, Measure B does not place a limit on the amount of contributions that can be made to independent expenditure committees or *to committees that raise money to support or oppose a City ballot measure*." Thus, we conclude that Measure B's aggregate contribution limits apply only to contributions made, directly or indirectly, to that candidate, and not to contributions made

to ballot measure committees.  As Measure B's aggregate limits only apply to the candidate, they are constitutional under the First Amendment for the same reasons held above, and do not improperly discriminate between candidates based on the candidate's sponsorship of ballot measures.

## CONCLUSION

For the foregoing reasons, we affirm the district court's order granting summary judgment in favor of the City and denying MOF's motion for summary judgment.

**AFFIRMED**.

---

COLLINS, Circuit Judge, with whom VANDYKE, Circuit Judge, joins, dissenting:

I was the author of the panel opinion in this case, *see Moving Oxnard Forward, Inc. v. Ascension*, 124 F.4th 605 (9th Cir. 2024), and I adhere to that opinion's conclusion that the limits on campaign contributions adopted by Defendant City of Oxnard, California ("the City") violate the First Amendment.  Because the en banc court's majority opinion now concludes otherwise, I respectfully dissent.[1]

In this case, the City adopted campaign finance limitations that, as explained in the City's supporting materials, would have little practical impact on any recent

---

[1] Given my prior authorship of the panel opinion, in this dissent "I will borrow liberally (and often verbatim) from that panel decision, and I will do so without the cumbersome use of quotation marks and without providing citations to my prior panel opinion."  *Estate of Hernandez v. City of Los Angeles*, 139 F.4th 790, 816 n.1 (9th Cir. 2025) (en banc) (Collins, J., dissenting).

candidates for municipal elections except for one—Aaron Starr, the President of Plaintiff Moving Oxnard Forward, Inc. ("MOF"). Starr has been very active in Oxnard politics, and in doing so he has consistently relied on larger-dollar contributions that, as the City notes, made him a "stark" "outlier" among local candidates. The new campaign contribution limitations, which the City admits "will force [Starr] to change this practice," were proposed by the City the year after Starr engineered an ultimately unsuccessful recall effort against a majority of the City Council and came in second in the race for Mayor. And prior to that, Starr and MOF had successfully supported a ballot initiative that overturned the City Counsel's increase in certain fees and that then became the subject of litigation between Starr and the City. Acting on behalf of itself and its members (including Starr), MOF challenged these new campaign finance limitations as a violation of the First Amendment, but the district court granted summary judgment to the City. MOF has appealed.

In reviewing MOF's First Amendment challenge to the City's new campaign-contribution limits, I would hold that the City has failed to carry its threshold burden to show that these limits "further the important state interest of preventing *quid pro quo* corruption or its appearance." *Lair v. Motl*, 873 F.3d 1170, 1180 (9th Cir. 2017). Although the City's meager evidence may be enough to satisfy *Lair*'s low standard—which states that the City "must show *only* that the perceived threat *is not illusory*," *id*. at 1178 (simplified) (emphasis added)—that standard is inconsistent with current Supreme Court authority and we should take this opportunity to overrule it en banc. And under the correct standard, the City's evidence is patently inadequate. On that basis alone, the City's limitations violate the First Amendment.

I would also further conclude that, even if the City met its threshold burden, the challenged limitations do not survive the appropriate level of scrutiny that then applies. On this record, the City's contribution limits present sufficient "danger signs" of "constitutional risks to the democratic electoral process" to require us to "examine the record independently and carefully to determine whether [the City's] contribution limits are 'closely drawn' to match" the asserted interest in avoiding the appearance of *quid pro quo* corruption. *Randall v. Sorrell*, 548 U.S. 230, 248–49, 253 (2006) (plurality). Specifically, the record reflects a significant risk that the City may be engaged in "invidious discrimination" against Starr and challengers like him. *Buckley v. Valeo*, 424 U.S. 1, 31 (1976). And, upon conducting that independent and careful review, I would conclude that the City's contribution limits are not "narrowly tailored." *Randall*, 548 U.S. at 261.

For all of these reasons, I would hold that the City's contribution limits violate the First Amendment, and I dissent from the majority's contrary holding.

# I

## A

Aaron Starr is a resident of Oxnard and the President of MOF. MOF is a nonprofit corporation whose purpose, according to Starr, "is to make local government more efficient and make sure that residents receive value for the taxes and fees they pay." Toward that end, "MOF engages in advocacy for and against proposed legislation and ballot measures in the City." In addition, several of MOF's members have run for local office or have supported the campaigns of local candidates.

The electoral efforts of MOF and its members have had mixed success.  Starr unsuccessfully ran for a spot on the City Council in 2014, 2016, and 2020, and he came in second in the 2018 mayoral race.  MOF, however, has had greater success in sponsoring ballot initiatives.  In 2016, Oxnard voters passed MOF-sponsored "Measure M," which repealed an increase in the City's wastewater fees.[2]  In 2020, four MOF-supported initiatives were on the local ballot, and three of them were approved by the voters.[3]

In supporting these various campaigns, MOF's and Starr's preference has been, as the City puts it, "to raise large sums of money from a small number of donors."  For example, in 2018, Starr raised $8,250 from just five contributors, and more than half of the money he raised involved contributions in excess of $500.  However, in October 2019, the Oxnard City Council placed "Measure B" on the ballot to coincide with the March 2020 presidential primary election.  Among other things, Measure B would limit an individual's contributions to City Council candidates to $500 per election and to citywide candidates (such as for Mayor) to $750.  The voters approved Measure B, and it took effect on May 1, 2020.

## B

Four days after Measure B took effect, MOF filed this § 1983 action against the Oxnard City Clerk in her official

---

[2] Measure M, however, was subsequently invalidated in state court on state-law grounds.  *See City of Oxnard v. Starr*, 2020 WL 6042024 (Cal. Ct. App. 2020).

[3] The City challenged two of the three successful initiatives in state court and prevailed as to one on state-law grounds and lost as to the other.  *City of Oxnard v. Starr*, 303 Cal. Rptr. 3d 819, 823–24 (Ct. App. 2023).

capacity.[4]   The complaint seeks declaratory and injunctive relief against Measure B on behalf of MOF and its members. As relevant here, the complaint asserts two federal claims.

MOF's first cause of action alleges that the various per-candidate contribution limits imposed by Measure B violate the Free Speech Clause of the First Amendment, as made applicable to the States by the Fourteenth Amendment. Specifically, MOF challenges the following limits on contributions that may be made by a "person" to a "candidate for elective office" under the provisions that Measure B added to a new Article VI of Chapter 2 of the Oxnard City Code:

- An aggregate limitation of $500 per election for any given individual's contributions to any one candidate for City Council.  *See* OXNARD CITY CODE § 2-243(A).

- An aggregate limitation of $1,000 per election for contributions by any given "political action committee" to any one candidate for City Council.  *Id*.

- Comparable aggregate contribution limits for candidates for Mayor, City Clerk, and City Treasurer, except that the contribution limitation for individuals to such candidates is $750 and the limit for

---

[4] Because the action against the Clerk in her official capacity is functionally against the City, *see Lewis v. Clarke*, 581 U.S. 155, 162 (2017), I will follow the majority in referring to the Defendant as "the City."  *See* Opin. at 6 n.1.

political action committees is $1,500. *Id.* § 2-244(A).

- An aggregate limitation of $500 per election for any loan to any candidate for any elected City office. *Id.* §§ 2-243(B), 2-244(B).

These City Code provisions further specify that these numerical contribution limits "shall be adjusted every two (2) years by resolution of the City Council" in accordance with a specified formula. *Id.* §§ 2-243(A), 2-244(A); *see also id.* § 2-245.[5]

MOF's second cause of action challenges an additional feature of the contribution limits enacted by Measure B. Specifically, in calculating the aggregate contributions made by an individual or by a political action committee for purposes of the measure's contribution limitations, these provisions include, not just contributions to the candidate, but also "contributions or loans to all political committees or broad-based political committees controlled by the

---

[5] In challenging these provisions, MOF claims that these limits on contributions by any "person" to a "candidate" also apply to contributions made by the *candidate* to his or her own campaign. The district court rejected this reading of Measure B, and I agree. By using the distinct terms "person" and "candidate," the measure's language is more naturally read as denoting that those individuals are not the same. And if I had any residual doubt on this score, the canon of constitutional avoidance would require reaching that same conclusion, because, as the City concedes, a contrary reading would render Measure B patently unconstitutional. *See Buckley*, 424 U.S. at 53 (holding that a limitation on a candidate's expenditures on his or her own campaign would violate the First Amendment). Accordingly, I proceed on the understanding that Measure B does not apply to a candidate's contributions to his or her own campaign.

candidate and in-kind contributions." OXNARD CITY CODE §§ 2-243(A), 2-244(A). MOF alleges that, as applied to a candidate for City office who simultaneously controls a political committee supporting or opposing a City ballot initiative—as Starr has done—these provisions would force that candidate "to choose between receiving a maximum contribution to either his or her campaign or to the ballot measure committee or . . . to divide the maximum contribution in some way between the two." MOF alleges that, because an individual who is running a ballot-initiative campaign and who is *not* a candidate for City office is not subject to any limits on how much he or she may receive as a contribution to that campaign, the resulting asserted disparate treatment violates both the Free Speech Clause of the First Amendment as well as the Equal Protection Clause of the Fourteenth Amendment.[6]

In late April 2021, the parties filed cross-motions for summary judgment. The district court granted the City's

---

[6] Measure B also enacted additional provisions that limited gifts to certain City officials, *see* OXNARD CITY CODE §§ 2-250, 2-251, as well as provisions instituting term limits for City elected officials, *see id*. §§ 2-3, 2-4. Although MOF initially challenged the gift limitations in a third cause of action in its complaint, MOF has expressly abandoned any such challenge in this court. Measure B's term limits became the subject of separate litigation between Starr and the City after the City declined to submit to the voters Starr's competing initiative concerning term limits. *See Starr v. Chaparro*, 288 Cal. Rptr. 3d 885, 887 (Ct. App. 2022). Instead, the City adopted Starr's initiative proposal as an ordinance *before* Measure B's passage, with the result that Measure B overrode Starr's proposal. *Id*. The California Court of Appeal held that the City's failure to submit Starr's initiative to the voters violated state law, and it ordered Starr's initiative to be placed on the November 2022 ballot. *Id*. at 899. Starr's initiative then passed, and it controlled over Measure B's relevant term limit provision. *See* OXNARD CITY CODE § 2-4 (as amended by the electorate on November 8, 2022).

motion, denied MOF's motion, and entered judgment for the City on all claims. MOF timely moved to alter or amend the judgment, and the district court denied that motion. MOF timely appealed the next day. This court has jurisdiction under 28 U.S.C. § 1291, and we must review the district court's grant of summary judgment de novo. *See Sandoval v. County of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018).

## II

I begin by addressing MOF's first cause of action, which asserts that Measure B's various contribution limits violate the First Amendment.

## A

Under *Thompson v. Hebdon*, 589 U.S. 1 (2019), the controlling standards for assessing whether a campaign contribution limit violates the First Amendment are set forth in Justice Breyer's plurality opinion in *Randall v. Sorrell*, 548 U.S. 230 (2006).[7] Under *Randall*, "contribution

---

[7] In *Thompson*, this court had declined to apply the *Randall* plurality opinion because no opinion in that case had "commanded a majority of the Court." *Thompson*, 589 U.S. at 4 n.* (quoting *Thompson v. Hebdon*, 909 F.3d 1027, 1037 n.5 (9th Cir. 2018)). The Supreme Court unanimously reversed our decision, noting that 10 other circuits had "correctly looked to *Randall* in reviewing campaign finance restrictions." *Id*. Indeed, the settled rule is that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (citations and internal quotation marks omitted). In *Randall*, Justice Breyer's plurality opinion for three Justices applied a form of lesser scrutiny rooted in *Buckley v. Valeo*, 424 U.S. 1 (1976), in striking down the contribution limitations at issue there, *see Randall*, 548 U.S. at 246–62 (Breyer, J., joined by Roberts, C.J., and Alito, J.), and two other

limitations are permissible as long as the Government demonstrates that the limits are 'closely drawn' to match a 'sufficiently important interest.'"   *Id*. at 247 (plurality) (quoting *Buckley v. Valeo*, 424 U.S. 1, 25 (1976)).

The Supreme Court has "identified only one legitimate governmental interest for restricting campaign finances: preventing corruption or the appearance of corruption." *McCutcheon v. FEC*, 572 U.S. 185, 206–07 (2014) (plurality).[8]  "Moreover, while preventing corruption or its appearance is a legitimate objective, [a legislative body] may target only a specific type of corruption—'*quid pro quo*' corruption," a phrase that refers only to "a direct exchange of an official act for money." *Id*. at 192, 207; *see also id*. at 192 (reaffirming that "[i]ngratiation and access are not corruption" (simplified)); *Citizens United v. FEC*, 558 U.S. 310, 359 (2010) ("When *Buckley* identified a sufficiently

---

Justices applied strict scrutiny in reaching the same result, *see id*. at 267–73 (Thomas, J., joined by Scalia, J., concurring in the judgment).  The "lowest common denominator" between those two opinions, *see Nichols v. United States*, 511 U.S. 738, 745 (1994), is the plurality's narrower holding that the contribution limits were invalid even under a lesser form of scrutiny than strict scrutiny.  *See Randall*, 548 U.S. at 272 (Thomas, J., concurring in the judgment) (noting that the plurality did not "err[] in concluding that these limits are too low to satisfy even *Buckley*'s lenient standard").  Accordingly, under both *Marks* and *Thompson*, the *Randall* plurality opinion is controlling.

[8] As in *Randall*, Justice Thomas concurred only in the judgment in *McCutcheon*, adhering to his view that campaign contribution limitations should be subject to strict scrutiny.  *See McCutcheon*, 572 U.S. at 228 (Thomas, J., concurring in the judgment).  Because the *McCutcheon* plurality's reasons for invalidating the limits at issue in that case reflect the "narrowest grounds" for sustaining that judgment, the *McCutcheon* plurality's opinion, like the *Randall* plurality's opinion, is binding on this court.  *See Marks*, 430 U.S. at 193; *see also supra* note 7.

important governmental interest in preventing corruption or the appearance of corruption, that interest was limited to *quid pro quo* corruption."). "And because the Government's interest in preventing the *appearance* of corruption is equally confined to the appearance of *quid pro quo* corruption, the Government may not seek to limit the appearance of mere influence or access." *McCutcheon*, 572 U.S. at 208 (emphasis added).

In order to justify *any* limit on campaign contributions based on this asserted interest, a legislative body cannot rely on "mere conjecture" and must instead point to some threshold evidentiary basis for concluding that voters in that jurisdiction "would tend to identify a big donation with a corrupt purpose." *Nixon v. Shrink Mo. Gov't PAC*, 528 U.S. 377, 391–92 (2000); *see also McCutcheon*, 572 U.S. at 218 (plurality) (holding that "speculation . . . cannot justify the substantial intrusion on First Amendment rights" involved in a limitation on campaign contributions); *Lair v. Motl*, 873 F.3d 1170, 1178 (9th Cir. 2017) (holding that the government must carry this "threshold" burden to show "whether *any* level of limitation is justified").

If the government carries this threshold burden to "offer[] adequate evidence that its [contribution] limits further the important state interest of preventing *quid pro quo* corruption or its appearance," the court must next consider whether the particular contribution limit at issue is "closely drawn" to this sole legitimate interest. *Lair*, 873 F.3d at 1180. With respect to this inquiry, the Supreme Court has cautioned that the courts are poorly positioned to "determine with any degree of exactitude the precise restriction necessary to carry out" this "legitimate objective[]." *Randall*, 548 U.S. at 248. Because legislative bodies are generally "better equipped to make such empirical

judgments," *Randall* explained, the courts "ordinarily" should "defer[] to the legislature's determination of such matters." *Id.*

*Randall* also noted, however, that there will be circumstances in which a restrictive contribution threshold will present "constitutional risks to the democratic electoral process" that are "too great." 548 U.S. at 248. In such cases, deference is inappropriate, and the courts must exercise "independent judicial judgment." *Id.* at 249. Thus, "where there is strong indication in a particular case, *i.e.*, danger signs, that such risks exist (both present in kind and likely serious in degree), courts, including appellate courts, must review the record independently and carefully with an eye toward assessing the statute's 'tailoring,' that is, toward assessing the proportionality of the restrictions." *Id.* In assessing a statute's tailoring when such danger signs are present, the courts must consider "the serious associational and expressive problems" presented by the statute and determine whether there is "any special justification" that would warrant upholding the statute's restrictions in light of those concerns. *Id.* at 261.

**B**

As noted, the threshold question in applying these standards is whether the City has carried its initial burden to show that Measure B's individual contribution limitations "further the important state interest of preventing *quid pro quo* corruption or its appearance." *Lair*, 873 F.3d at 1180. Our precedent has described this threshold burden as a low one that requires a showing "only that the perceived threat" of corruption "is more than mere conjecture" and "is not illusory." *Id.* at 1178 (simplified) (quoting *Montana Right to Life Ass'n v. Eddleman*, 343 F.3d 1085, 1092 (9th Cir.

2003)).   The majority expressly reaffirms that very low *Lair*/*Eddleman* standard and finds that the City has met it. *See* Opin. at 15–20, 32–33.  In my view, that low standard is inconsistent with Supreme Court authority, and we should have taken this opportunity to overrule it.  And under the proper standard, the City has not carried its threshold burden.

### 1

Even under the lesser scrutiny that applies to campaign contributions under *Randall*, "the [g]overnment must prove at the outset that it is *in fact* pursuing a legitimate objective." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (emphasis added). As noted, the only such "legitimate objective" the Court has recognized for restricting campaign finances is "the prevention of '*quid pro quo*' corruption or its appearance." *Id*.; *see also McCutcheon*, 572 U.S. at 206–07 (plurality). The government cannot rely on "mere conjecture" that this interest is being furthered, nor can it "simply posit the existence of the disease sought to be cured." *Cruz*, 596 U.S. at 307 (citations omitted).  "It must instead point to 'record evidence or legislative findings' demonstrating the need to address a special problem" through the proposed restrictions. *Id.* (citation omitted).  To carry its threshold burden, the government must point to evidence "substantiat[ing]" a genuine "concern," *Nixon*, 528 U.S. at 393, about "*quid pro quo* corruption in th[e] context" of the conduct sought to be regulated, *Cruz*, 596 U.S. at 307.[9]

---

[9] The majority mischaracterizes this standard, relying on the strawman argument that it would require "evidence of *actual* instances of *quid pro quo* corruption."  *See* Opin. at 31 (emphasis added).  What is required is evidence substantiating a concern about real or apparent *quid pro quo* corruption relating to campaign contributions, and not merely non-

Thus, although *Nixon* noted in 2000 that the Court had not yet adopted a requirement that "governments enacting contribution limits must demonstrate that the recited harms are real, not merely conjectural," *Nixon*, 528 U.S. at 392–93 (simplified) (rejecting the view that *Colorado Republican Federal Campaign Committee v. Federal Election Commission*, 518 U.S. 604 (1996), had imposed this requirement but then declining to "further defin[e] . . . whatever the State's evidentiary obligation may be"), the Court's subsequent caselaw makes clear that it has now done so. As Judge Ikuta cogently explained:

> In light of the Supreme Court's clarification [of its law in this area], a state can justify imposing regulations limiting individuals' political speech (via limiting political contributions) only by producing evidence that *it has a real problem in combating actual or apparent quid pro quo corruption . . . .* To meet this test here, a state must show that it has a realistic need to prevent acts that "would be covered by bribery laws," *Citizens United*, 558 U.S. at 356, by (for instance) presenting evidence that large monetary contributions were made "to control the exercise of an officeholder's official duties," *McCutcheon*, [572 U.S. at 208], or "point[ing] to record evidence or legislative findings suggesting any special corruption problem," *Colo. Republican Fed. Campaign Comm. v. FEC*, 518 U.S. 604, 618 (1996)

---

illusory grounds for a generalized concern about undue influence or access.

(principal opinion).  One thing is certain: the state cannot carry its burden with evidence showing only that large contributions increase donors' influence or access. *McCutcheon*, [572 U.S. at 192, 208].  Even if the "line between *quid pro quo* corruption and general influence may seem vague at times . . . 'the First Amendment requires us to err on the side of protecting political speech rather than suppressing it.'"  *Id*. at [209] (quoting *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 457 (2007) (opinion of Roberts, C.J.)).

*Lair v. Motl*, 889 F.3d 571, 574 (9th Cir. 2018) (Ikuta, J., dissenting from denial of rehearing en banc) (emphasis added).

We thus should have taken this opportunity to overrule *Lair* and *Eddleman*.  A mere showing that concerns about *quid pro quo* corruption are not "conjecture" or "illusory" is not enough to carry the government's threshold burden.  For the reasons that Judge Ikuta has explained, *see id*., such a standard is inconsistent with current Supreme Court authority because, in practice, that standard allows the government to enact contribution limits based merely on broad and amorphously defined concerns about "the appearance of mere influence or access."  *McCutcheon*, 572 U.S. at 208.  Indeed, the Supreme Court in *Thompson* approvingly noted that, in the opinion under review in that case, this court had "acknowledged that '*McCutcheon* and *Citizens United* created some doubt as to the continuing vitality of [the *Lair*/*Eddleman*] standard.'"  *Thompson*, 589

U.S. at 349 (quoting *Thompson v. Hebdon*, 909 F.3d 1027, 1034 n.2 (9th Cir. 2018)).

**2**

Under the correct threshold standard, the City's evidence is plainly inadequate to justify its adoption of campaign contribution limits.

The City relies primarily on the Ventura County District Attorney's ("DA") 2012 "Report on the Public Integrity Investigation of Oxnard City Officials" (the "Report"). The Report detailed the results of the DA's investigation into five allegations of wrongdoing by City officials, three of which involved alleged "misappropriation" of taxpayer funds by City officials and another of which involved City officials' alleged violations of "conflict of interest laws by approving multi-million dollar city contracts from which they stood to profit." The final allegation of misconduct was that City officials had assertedly "received gifts of vacations, meals, rounds of golf, and event tickets from companies doing significant business with the city, without publicly declaring the gifts as required by law." As to that latter allegation, the DA reached the following conclusion:

> Several city officials failed to declare gifts they received. The failures to declare gifts of meals, golf and event tickets have been referred to the Fair Political Practices Commission for administrative enforcement action. There is insufficient evidence to prove the most serious allegations involving

gift vacations and the statute of limitations
has expired as to many of the gifts.

In its briefs in the district court and in this court, the City did not contend that the DA's Report had revealed any actual examples of *quid pro quo* corruption. Instead, it relied on generalized claims that the Report had revealed that "City elected officials have engaged in misconduct and unethical behavior in the last decade." But the City claimed at oral argument before the en banc court that the Report does present examples of actual or perceived *quid pro quo* corruption in the City. The majority endorses that view and has made these alleged examples a centerpiece of its opinion, both in its statement of the facts and in its analysis of this threshold-burden issue. *See* Opin. at 6–9, 16–17. For several reasons, however, the majority's reliance on various examples drawn from the Report is unavailing.

First, in examining the information presented in the Report, the majority completely loses sight of the relevant standard of review. Because this case involves a district court's grant of summary judgment to the City, this court must "view[] the evidence in the light most favorable to the non-moving party," namely, MOF. *Far Out Prods., Inc. v. Oskar*, 247 F.3d 986, 992 (9th Cir. 2001). The majority instead tendentiously reads the record in favor of the City, even to the point of ignoring the Report's own conclusions about the examples that the majority discusses.

For instance, the majority relies heavily on two examples that it contends show that City officials took actions that were favorable to an Oxnard businessman who had recently given expensive gifts of travel to the relevant officials. *See* Opin. at 16–17. Specifically, the majority says that the Report shows that (1) the day after taking a trip to Cabo San

Lucas aboard the "private jet" of "Oxnard businessman Bernard Huberman," City Councilmember Herrera "voted to approve the City's multi-million dollar purchase of a building from a Huberman-affiliated company"; and (2) three months after accompanying Huberman on his private jet on a trip to Napa, Mayor Holden "approved a bid that a Huberman-affiliated company made for a City contract." *See* Opin. at 6–8, 16–17. Conspicuously absent from the majority's recitation are the Report's conclusions that (1) the "available evidence shows that . . . Holden exchanged sufficiently fair value for [his] travels" and (2) "there is insufficient evidence to prove whether [Herrera's] travel was a gift or fair value was exchanged." In other words, the Report affirmatively concluded that the travel provided to Holden was *not* a gift, and it further concluded that there was *insufficient evidence* to show that Herrera's travel *was* a gift. Moreover, in addressing the "appearance of impropriety" created by Herrera's vote on the building sale a day after flying with Huberman from Cabo San Lucas, the Report noted that both Herrera and Holden had "long-term personal relationships with Huberman," that Herrera's close relationship with Huberman preceded his time on the City Council, and that Herrera's occasional flights with Huberman over the years did "not constitute a financial interest within the meaning of the conflict of interest laws." Viewing the Report in the light most favorable to MOF, these two examples show, at best, "the appearance of mere influence or access," and not the appearance of *quid pro quo* corruption. *McCutcheon*, 572 U.S. at 208.

Similarly unavailing is the majority's reliance on the Report's statement that the City's Public Works Director admitted that he had accepted tickets and transportation to a

Lakers game from a company that, at the time, had "significant business" with the Department, including contracts that the Director had approved. *See* Opin. at 7. The Report concluded that, although the receipt of these gifts "plainly violate[d] the city's policy against accepting gifts of more than $50 from entities with whom the city is doing business," the evidence was "insufficient to prove that the officials had a criminal conflict of interest regarding the contracts" they approved.

Second, the meager evidence that the majority selectively cites bears no relationship at all to the First Amendment activity that the City seeks to regulate here— namely, campaign contributions. The three incidents the majority cherry-picks from the Report had nothing to do with campaign contributions, and they are temporally far removed from the City's effort to regulate such contributions: these incidents all occurred between *10 and 13 years* before the City proposed Measure B, and the Report itself was issued more than seven years before Measure B was proposed. Moreover, the Report identifies a number of areas that are in need of reform, but campaign contributions are not among them. And, importantly, the City's own evidence in this case shows that large campaign contributions have never been a problem in the City, either in the time period covered by the Report or in the years since. As the City itself notes, "the sorts of large contributions that [Measure B] prohibits were quite rare even before its adoption." Indeed, in the most recent election preceding Measure B's proposal, nearly 94% of all contributions were within the limits being proposed, and only two candidates for office raised a majority of their funds from contributions that would exceed Measure B's limits.

According to the majority, it does not matter that the City was unable to point to any evidence related specifically to campaign contributions.  *See* Opin. at 15–20.  But the majority cites no Supreme Court case that endorses that view, and I am aware of none.  Indeed, the Supreme Court cases that have upheld campaign contribution limits have relied on evidence in the relevant jurisdiction that large *campaign contributions* had created an appearance of *quid pro quo* corruption.  *See Nixon*, 528 U.S. at 393–94 (citing numerous examples of troubling five- or six-figure contributions from corporations or corporate-related PACs in Missouri); *Buckley*, 424 U.S. at 27 (noting that the court of appeals' opinion in that case detailed a number of "deeply disturbing examples" of troubling campaign contributions that "surfac[ed] after the 1972 election").

The majority argues that contribution-specific evidence should not be required, because a showing of corruption with respect to *gifts* should be enough to justify the prophylactic measure of limiting *campaign contributions*.  *See* Opin. at 15–17.  The problem with this faulty syllogism is that the giving of personal gifts to government officials is generally not an expressive activity protected by the First Amendment, but the giving of campaign contributions is.  *See United States v. Ring*, 706 F.3d 460, 466 (D.C. Cir. 2013) ("[T]he First Amendment interest in giving [gifts] to public officials is, at least compared to the interest in contributing to political campaigns, *de minimis*.").  And because the government's burden in justifying any particular regulation of campaign contributions is to present evidence concerning actual or perceived "*quid pro quo* corruption *in this context*," *Cruz*, 596 U.S. at 307 (emphasis added), the City cannot rely on problems relating *only* to a separate category of unprotected activity as its basis for regulating protected activity.  At a

minimum, the City cannot do so without first demonstrating why regulation directed to the problematic unprotected activity (*viz.*, the giving of personal gifts to City officials) will not suffice to address the problems presented by that activity. Indeed, Measure B contains a *separate* provision that broadly bans all personal gifts to any elected City official from "any person or entity that contracts or is seeking to contract with the City," OXNARD CITY CODE §§ 2-250(A), and that provision is not challenged here. Allowing the City—without any additional evidence—to go beyond the regulation of gifts and to also regulate a distinct class of First-Amendment-protected conduct would create a mismatch that raises the specter that the City's "stated interests are not the actual interests served by the restriction." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993).[10]

Accordingly, the City's reliance on the Report's discussion of allegedly improper gifts is insufficient to carry its threshold burden. The remaining items relied upon by the City are even more clearly insufficient. Specifically, the City points to (1) a citizen survey that, among other things, asked City voters whether they "would support a Government Accountability measure"; and (2) the fact that Measure B passed with 82% of voters voting in favor. But "Government Accountability" can mean almost anything intended to make government operations more efficient, effective, responsive, and ethical, and nothing in the record suggests that regulation of *campaign contributions* formed any part of the question posed to survey participants about "Government Accountability." Likewise, given that Measure B packaged together gift restrictions, term limits, *and* campaign-

---

[10] As I shall explain, that specter is no mere phantasm here. *See* section II(C) *infra*.

contribution limits, the approving voters may have placed differing weights on these distinct components in casting their ballots—thereby making it difficult, if not impossible, to say that the City's voters "determined that *contribution limits* are *necessary* to combat corruption and the appearance thereof."   *Nixon*, 528 U.S. at 908 (emphasis added) (simplified); *see also* 1994 Missouri Session Laws 1249–51 (containing the text of the proposition at issue in *Nixon*, which narrowly focused on campaign contributions).

Although the City's evidence might be sufficient to satisfy the embarrassingly low *Lair*/*Eddleman* standard— which states that the City "must show only that the perceived threat is not illusory" or "mere conjecture," *Lair*, 873 F.3d at 1178 (simplified)—it does not meet the correct, more demanding standard required under current Supreme Court authority.

## C

But even if the City had made the threshold showing that its limits on campaign contributions "further the important state interest of preventing *quid pro quo* corruption or its appearance," *Lair*, 873 F.3d at 1180, I would still reverse the district court's grant of summary judgment to the City.  In my view, (1) Measure B presents sufficient "danger signs" to warrant our "examin[ing] the record independently and carefully to determine whether [Measure B's] contribution limits are 'closely drawn' to match" the asserted interest in avoiding the appearance of *quid pro quo* corruption, *Randall*, 548 U.S. at 253; and (2) Measure B's individual contribution limits do not survive that independent scrutiny.

**1**

The City contends—and the majority agrees—that, under *Randall*, the "danger signs" that would trigger independent scrutiny are limited to the following four specific danger signs that the Court identified in that case: (1) the contribution limits at issue apply "per election cycle, which includes *both* a primary and a general election"; (2) the "limits apply both to contributions from individuals and to contributions from political parties"; (3) the "limits are well below the limits th[e] Court upheld in *Buckley*" and "below the lowest limit th[e] Court has previously upheld"; and (4) the limits are "substantially lower than . . . comparable limits in other States" and are not "indexed for inflation." *Randall*, 548 U.S. at 249–53, 261 (emphasis added); *see also* Opin. at 20–21. However, nothing in *Randall* suggests that this list of "danger signs" is exhaustive. On the contrary, *Randall* frames a general standard that asks whether a given set of limitations presents "*constitutional risks to the democratic electoral process*" that are "too great." 548 U.S. at 248 (emphasis added). An example would be, as in *Randall*, when the extremely restrictive nature of the contribution limit threatens to "harm the electoral process by preventing challengers from mounting effective campaigns against incumbent officeholders, thereby reducing democratic accountability." *Id*. at 249. But nothing in *Randall* supports the majority's suggestion, *see* Opin. at 35–36, that that is the *only* manner in which a contribution limitation may be said to present "constitutional risks to the democratic electoral process," *Randall*, 548 U.S. at 248.

Moreover, *Buckley* itself underscored that its more lenient standard of review only applies "*[a]bsent record evidence of invidious discrimination* against challengers as a

class" or against candidates with particular "present occupations [*e.g.*, non-incumbents], ideological views, or party affiliations." *Buckley*, 424 U.S. at 31 (emphasis added). Given that *Buckley* confirms that such invidious discrimination would preclude application of *Buckley*'s deferential scrutiny, it follows that, under *Randall*, such discrimination is also the sort of "constitutional risk[] to the democratic electoral process" that would require courts to assess the "tailoring" of the contribution limits "independently and carefully." *Randall*, 548 U.S. at 248–49, 253.[11]

We have explained that, in this context, "invidious discrimination" includes discrimination on constitutionally suspect grounds, such as race or sex, as well as "discrimination that tends to harm or repress minority parties" or "independent candidacies." *National Comm. of the Reform Party of the U.S. v. Democratic Nat'l Comm.*, 168 F.3d 360, 366 (9th Cir. 1999) (quoting *Buckley*, 424 U.S. at 34). Moreover, it is well settled that "invidious" discrimination includes "an effort to suppress the speaker's activity due to disagreement with the speaker's view," *Metro Display Advert., Inc. v. City of Victorville*, 143 F.3d 1191, 1194 (9th Cir. 1998) (citation omitted), and that such discrimination may be present even with respect to ostensibly facially neutral laws, *see NAACP v. City of Richmond*, 743 F.2d 1346, 1356 (9th Cir. 1984).

---

[11] The majority is therefore wrong in suggesting that such invidious discrimination cannot be considered *within* the *Randall* framework and can only be addressed in the context of "an equal protection claim under the Fourteenth Amendment or a viewpoint discrimination or retaliation claim under the First Amendment," or some other "claim based on alleged discrimination from the City Council." *See* Opin. at 36.

Under these standards, I believe that the undisputed facts concerning Measure B raise a sufficient danger of invidious discrimination to warrant application of "independent[] and careful[]" scrutiny under *Randall*.  548 U.S. at 249, 253.  In particular, there are "danger signs" in the record that Measure B, both in its formulation and in its operation, differentially targets Starr, who has repeatedly challenged the incumbent City government and its policies.[12]

First, the legislative record indicates that Starr and his reliance on larger-size contributions were a target of the City Council when it proposed and promoted Measure B.  In his declaration in the district court, City Manager Alexander Nguyen stated that, "to educate the voters about Measure B in advance of the March 3, 2020 election," his office "maintained a page on the City's website titled 'About Measure B—The Oxnard Government Accountability and Ethics Act.'"  Among the materials uploaded onto that webpage was a PowerPoint slide deck that Nguyen used to give a presentation in February 2020 to the "Inter-Neighborhood Council Organization," a group "made up of the chairpersons of each active neighborhood council."  The

---

[12] The majority contends that, in reaching this conclusion, I am raising issues that "the parties did not raise or brief."  *See* Opin. at 37.  That is wrong.  MOF has consistently argued, both in its summary judgment papers below and in its opening brief in this court, that Measure B was specifically crafted "to reduce the amount of money Starr spent on campaigns in the City" and that Measure B is focused more on that improper interest than on *quid pro quo* corruption.  And it is a familiar principle of appellate decisionmaking that "when an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law." *Does v. Wasden*, 982 F.3d 784, 793 (9th Cir. 2020) (quoting *Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 99 (1991)).

PowerPoint, entitled "Measure B: The Oxnard Government Accountability and Ethics Act," provides an overview for voters of what Measure B would and would not do. The PowerPoint's 15 slides describe the measure's various provisions concerning gifts, term limits, and campaign contributions in largely general terms, with one notable exception. The last two slides consist of graphics devoted to showing a particular "[e]xample of the size and volume of campaign contributions for one candidate over [the] past several years." Although these two slides do not name who that "one candidate" is, there is no dispute that it is, in fact, Aaron Starr.

The first of these two slides consists of a map of the United States and a separate close-up map of California, with visual pins identifying each city from which Starr received a contribution, together with the amount of that contribution.[13] Many of the contributions listed are modest, but several are quite large, including a $12,000 contribution from someone in Woodland, California, and one for $8,000 from a resident of Austin, Texas. The slide contains, in the upper right, a large green banner stating "$70,000 RAISED OUTSIDE OF OXNARD." The second slide provides a pie chart and accompanying numbers summarizing the extent to which Starr relied on large contributions. The pie chart shows that, in terms of the number of contributions Starr had received, 68% of them were in an amount that was less than or equal to $750, and 32% were in amounts larger than $750. The slide also showed that, despite the smaller percentage of large contributions, the total *amount* raised from such contributions was much larger: the total raised from contributions that were over $750 each was $102,400,

---

[13] The slides are attached as an Appendix to this dissent.

whereas the total of the smaller-sized contributions was only $15,650. Next to the pie chart, there is a depiction of a large cartoon of green dollar bills adjacent to the following statement written in bold-face, all-capitals type: "TOTAL CAMPAIGN DONATIONS: $118,050." The number "$118,050" appears in oversized green font to match the dollar-bill color scheme. These slides' obvious focus on Starr as the very example for why these limits should be adopted raises an objective danger sign that invidious discrimination may be afoot. And, contrary to what the majority suggests, *see* Opin. at 35, that objective danger is not mitigated by the fact that the slide deck also includes, in an earlier summary of Measure B, more generalized statements concerning justifications for campaign contribution limits that were drawn from a 2019 California law imposing (much higher) default contribution limits for municipal elections. *See* 2019 Cal. Stat. ch. 556.

In his declaration in connection with the summary judgment proceedings below, Starr expressly asserted that the record concerning Measure B's enactment demonstrated that it was proposed by the City Council "as a way to reduce the amount of money [Starr] spend[s] in the City, both on [his] personal campaigns and in support of ballot measures [he] ha[s] proposed." In response, the City did not directly deny that Starr's fundraising practices had been a factor in the City Council's proposing of Measure B. Instead, it simply stated that (1) its purpose was "to minimize the perception that the City's elected officials are indebted to those who can provide . . . large campaign contributions"; and (2) "[n]either Measure B, nor the associated ballot materials mention[ed] Aaron Starr" by name.

Second, the record makes clear that, in terms of its practical effect on then-existing fundraising practices within

the City of Oxnard, Starr was the person who would most be affected by Measure B's passage and that few others would be significantly impacted. *Cf. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 535 (1993) ("[T]he effect of a law in its real operation is strong evidence of its object."). The City submitted an expert report that tallied the donations made in the 2018 election, which was the last election conducted before Measure B took effect and the first that was held after the City's shift from an at-large to a district-based City Council. The report concluded that "the sorts of large contributions that [Measure B] prohibits were quite rare even before its adoption." As the report explained, "[o]nly 18 of the 287 donors (6.3% of the donors) giving in Oxnard elections that year contributed sums that would have exceeded the limits" of Measure B, and the total amount of the raised funds by all candidates that exceeded those limits (*i.e.*, $25,200) represented 25.4% of the total raised (*i.e.*, $99,168). "For nearly all candidates," the report stated, "the proportions of their contributions that exceeded the limits were quite small." But there were a few exceptions. In particular, the report noted that "[o]nly two candidates raised the majority of their funds in contributions that . . . exceeded the limits," and "[o]ne was mayoral candidate Aaron Starr." With respect to Starr's campaign, 57.6% of his total funds raised came from contributions exceeding Measure B's limits. By contrast, as the City notes in its appellate brief, Starr's opponent—then-incumbent Mayor Tim Flynn—"would have lost less than 10% of the funds he raised if Measure B had been in effect," because "[o]nly one of Mr. Flynn's 76 donors made a contribution that would have exceeded Measure B's limits." As the City aptly summarizes, "Starr is an outlier among candidates,"

and "Starr's outlier status is even more stark when compared to other candidates' fundraising in the 2018 election."

Third, the record reveals a considerable history of antipathy between Starr and the City's elected officials over the years immediately preceding Measure B's adoption. Starr has been a sharp critic of the City's elected officials, and he was the "proponent of four recall petitions that triggered a special election" in May 2018 to decide whether to remove the Mayor and three other City Council members. These recall efforts all failed, however, and the four targets of the recall were still on the City Council when it unanimously decided to submit Measure B to the voters in October 2019. Starr and MOF also successfully proposed Measure M in 2016, which then became the subject of litigation between Starr and the City, with the City prevailing in its efforts to invalidate that measure in state court. *See supra* at 45 & note 2. Starr also unsuccessfully ran for City office himself on multiple occasions, coming in second against incumbent Mayor Flynn in the 2018 election. *See supra* at 45. As noted, all but one of Flynn's campaign contributions complied with the limits later proposed in Measure B, while most of Starr's did not. Less than a year after defeating Starr, Flynn voted in favor of Measure B, which the City notes "will force" Starr "to change" his fundraising practices and to "reach out to a broader base for smaller donations."

Taken together, these circumstances raise a sufficient constitutional risk of invidious discrimination against Starr and other outsiders like him. Given the substantial history of political disagreement between Starr and the City's elected officials; the singular and disproportionate burden that the campaign finance restrictions placed on Starr; and the City's stark use of Starr as the poster child for why these

limits should be adopted, there are ample danger signs here that the City's action in proposing Measure B may reflect "an effort to suppress the speaker's activity due to disagreement with the speaker's view," *Metro Display Advert., Inc.*, 143 F.3d at 1194 (citation omitted), or to "harm or repress . . . independent candidacies," *National Comm. of the Reform Party*, 168 F.3d at 366 (quoting *Buckley*, 424 U.S. at 34). Accordingly, under *Randall*, we should not apply deferential review in examining Measure B's contribution limits.

## 2

In my view, we therefore should proceed to "examine the record independently and carefully to determine whether [Measure B's] contribution limits are 'closely drawn' to match" the interest in avoiding the reality or appearance of *quid pro quo* corruption. *Randall*, 548 U.S. at 253.

The majority, for different reasons, assumes *arguendo* that we should apply such "independent" scrutiny in addressing the issue of tailoring here.[14] But the majority then limits its review to considering *only* the particular "five sets of considerations" that the *Randall* Court evaluated. 548 U.S. at 261. However, nothing in *Randall* suggests that the Court there was prescribing a mandatory checklist that must be mechanically applied in assessing narrow tailoring. Moreover, as I have explained, the "danger signs" that

---

[14] The majority relies on one of the "danger signs" mentioned in *Randall*, which is that the challenged contribution limits are "below the lowest limit th[e] Court has previously upheld." *Randall*, 548 U.S. at 251 (plurality). *See* Opin. at 23–25. The majority assumes *arguendo* that this danger sign is triggered if the dollar amount of the limit is below any that the *Supreme Court* has upheld, as opposed to any contribution limit that has been "upheld by lower courts." *See* Opin. at 24.

properly trigger independent scrutiny here are distinct from the specific concerns that were presented in *Randall*. Indeed, in addressing the issue of tailoring in *Randall*, the Court simply identified four case-specific features that presented particular concerns before asking, more generally, whether there was "any special justification that might warrant a contribution limit so low or so restrictive as to bring about the serious associational and expressive problems that [the Court] ha[s] described." *Id*.  In addition, the Supreme Court has made clear that, with respect to tailoring, the overall issue remains whether there is "a substantial mismatch between the [City's] stated objective" of combating corruption "and the means selected to achieve it." *McCutcheon*, 572 U.S. at 199 (plurality).  Accordingly, we are not limited to the specific considerations identified in *Randall* and must instead broadly consider whether, given the danger signs presented here, there is an unwarranted mismatch between the City's chosen means and professed objective.

   In addressing that issue, I begin by assessing whether Measure B's contribution limits are more "closely drawn" to fit (1) the City's asserted legitimate interest in avoiding actual or apparent *quid pro quo* corruption or (2) an alleged prohibited objective of squelching the political activities of Starr and others like him.[15]

---

[15] The majority is wrong in suggesting that this analysis, which takes account of the distinct danger sign presented in this case, entails an impermissible subjective inquiry into the legislative motivation of the City Council or the voters. *See* Opin. at 34–35.  Rather, the tailoring question is an objective one that asks whether the challenged measure is sufficiently closely drawn to the *legitimate* goal of avoiding the appearance or reality of *quid pro quo* corruption so as to dispel the particular "constitutional *risk*[]" that triggers the application of

In asserting that Measure B's particular contribution limits are needed to combat the appearance of corruption in Oxnard specifically, the City relies heavily on the above-described corruption scandal that occurred in Oxnard in 2010 and that led to the DA's Report. Although the DA ultimately concluded that "the most serious allegations of

---

independent scrutiny, *Randall*, 548 U.S. at 248 (emphasis added)—which here is the risk of invidious discrimination aimed at "suppress[ing] the speaker's activity due to disagreement with the speaker's view," *Metro Display Advert., Inc.*, 143 F.3d at 1194 (citation omitted). Insisting on sufficient tailoring to dispel the *risk* of invidious suppression of political opponents is not the same as finding the *reality* of such suppression. Indeed, settled First Amendment doctrine regularly employs different levels of scrutiny and associated tailoring requirements to address the ultimate risk that "the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see also Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 642 (1994) ("[R]egulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial *risk* of excising certain ideas or viewpoints from the public dialogue." (emphasis added) (citation omitted)); *Leathers v. Medlock*, 499 U.S. 439, 447 (1991) (noting that "differential taxation of First Amendment speakers is constitutionally suspect when it *threatens* to suppress the expression of particular ideas or viewpoints," but that there was no indication that the tax challenged in that case was objectively "structured so as to raise *suspicion* that it was intended" to "interfere with [cable television's] First Amendment activities" (emphasis added)). And it is certainly not a point in the City's favor that the record evidence of the risk of invidious discrimination here may also suggest the reality of such discrimination. *Cf. R.A.V. v. City of St. Paul*, 505 U.S. 377, 394 (1992) (noting that the "*possibility*" that the challenged ordinance's content-based selectivity creates for "seeking to handicap the expression of particular ideas" is "alone . . . enough to render the ordinance presumptively invalid," even while noting that the record evidence "elevate[d] the possibility to a certainty" (emphasis added)).

criminal conduct [we]re unsupported by the evidence," his Report in April 2012 identified at least the following five specific areas of concern: (1) a "clear pattern of fiscal waste by a small number of city officials" that allowed City officials to "spend excessively while traveling on city business"; (2) "an improper $10,000 personal loan of city funds" taken out by the then-City Manager, who also "implemented an improper retirement benefit for himself and other city management employees"; (3) improper use of funds regarding "a grand opening celebration at a city water facility"; (4) the fact that "several Oxnard officials received gifts of expensive meals, rounds of golf, and a small number of event tickets," and "did not publicly disclose the gifts as required by law"; and (5) the fact that "[c]lose relationships existed between several city officials and private individuals conducting multi-million dollar transactions with the city." The DA ultimately deferred to the judgment of others as to what changes in policies and practices should be made, but his Report did indicate that some of these issues may be ones "requiring reform."

For several reasons, this 2010 corruption scandal and resulting investigation bear, at best, a weak and tenuous relationship to Measure B's contribution limits. First, as I explained earlier, the problems canvassed in the Report had nothing to do with campaign contributions, or indeed with campaign financing at all. Campaign contributions were not identified as a source of corruption in the Report, and the Report does not recommend campaign contribution limits as a solution to any of the five problems it does identify. While Measure B's separate *gift* restrictions may well be closely drawn to the problems identified in the Report, those restrictions are not at issue here. Second, the City waited until late 2019 before proposing Measure B's gift restrictions

and campaign finance restrictions.  That timing is a full seven years after the Report, but only one year after (1) Starr had forced a recall election against the Mayor and three other members of the City Council; and (2) Starr himself had run against the Mayor, both at the recall election and in the 2018 general election.  Third, the 2010 scandal and the 2012 Report are not even mentioned as justifications for Measure B's campaign finance limitations in the City's explanatory PowerPoint; rather, that document focuses on Starr's receipt of campaign contributions in large dollar amounts and from out-of-State contributors.  On this record, Measure B's campaign finance limits are much more "closely drawn" to the prohibited objective of stopping Starr than they are to remedying the problems identified in the DA's 2012 Report.

The City again relies on the facts that, prior to proposing Measure B, the City commissioned a survey showing that 77% of voters "would support a Government Accountability measure" and that Measure B passed with 82% voting in favor.  But given that "Government Accountability" covers a number of different concerns and Measure B likewise contained a varied mix of provisions governing term limits, gift restrictions, and campaign finance limits, these points provide little, if any, basis for concluding that Measure B's *campaign finance restrictions*—as opposed to its other provisions—were specifically tailored to the public's concerns about local corruption.[16]

---

[16] Relying on a declaration from a City official, the majority again violates the standard of review applicable on summary judgment by uncritically parroting the City's view that "Measure B responded to the City's voters' demand for government accountability following the City's history of political scandals."  *See* Opin. at 6; *see also* Opin. at 5–6 (accepting as fact the City's claim that it "developed Measure B to address the public's stated desire to institutionalize good government

The practical effect of Measure B's campaign finance limitations also underscores the comparatively closer fit between these restrictions and the objective of squelching Starr. As the City's own expert and briefing repeatedly stress, Measure B's financing limitations would have little practical effect on anyone other than Starr, whom the City describes as a "stark" outlier. Although the City emphasizes that its campaign finance restrictions are in line with those of other comparably sized jurisdictions, that does not mean that *Oxnard's* restrictions are closely drawn to the legitimate interests invoked by those other jurisdictions. As the City's PowerPoint makes clear, Measure B's contribution limits were knowingly set at a level that, in their practical operation, would seriously and differentially affect Starr, while having minimal, if any, effect on every other politician identified in the City's briefing.[17]

Moreover, these concerns about the practical effect of Measure B are exacerbated by the fact that its campaign finance limits lack an adequate mechanism to ensure that they will be "adjusted for inflation." *Randall*, 548 U.S. at 261. The City points to the fact that Measure B added § 2-245 to the City Code, which states that the City Clerk shall adjust the contribution limits every two years to account for "changes in the Consumer Price Index." OXNARD CITY

---

practices"). The notion that the City was merely acting out of the desire to satisfy "voters' demand[s]" in adopting its campaign finance restrictions draws debatable inferences in the City's favor.

[17] The fact that, while this appeal was pending, Starr was nonetheless successful in getting elected to the City Council in the 2024 election, *see* Opin. at 26 n.5, does not detract from the fact that Measure B's finance limitations are substantially more closely tailored to the constitutional *risk* of invidious discrimination than they are to the legitimate interest in avoiding the appearance or reality of *quid pro quo* corruption.

CODE § 2-245(A).   But rather than make such changes automatically effective according to the specified formula, the City Council expressly *reserved to itself* the authority to review and adopt these changes "by resolution." *Id*.  Given that a resolution of the City Council is required to make any change to the limits—just as would be required to formally amend them—Measure B, as a practical matter, provides insufficient assurance that the limits will be raised as warranted by inflation.

Finally, there is no "special justification" in the record that might show that these contribution limits are warranted despite the significant concerns that I have described. *Randall*, 548 U.S. at 261.  Accordingly, an "independent[] and careful[]" "review [of] the record" confirms that Measure B's contribution limits are not "'closely drawn' to match the [City's] interests" in avoiding the reality or appearance of *quid pro quo* corruption. *Id*. at 249, 253.  The challenged per-candidate aggregate contribution limitations in Oxnard City Code §§ 2-243(A)–(B), 2-244(A)–(B) therefore violate the First Amendment.

## III

MOF's second cause of action challenges one specific feature of these same contribution limits, namely, that they assertedly include, as counting toward the amount of funds that may be contributed to a candidate, any contributions made to political committees supporting or opposing *ballot initiatives* if those committees are controlled by someone who is simultaneously a candidate for office.  The City contends that this claim is based on a misreading of Measure B and that such contributions to ballot initiative committees do *not* count towards the per-candidate aggregate contribution limits.  Given my view of this case, I need not

resolve this issue. Because I would conclude that, even apart from this alleged feature, the challenged contribution limits are invalid, any dispute concerning this additional issue is (in my view of the case) moot.

## IV

For the foregoing reasons, I would reverse the district court's grant of summary judgment to the City Clerk and remand with instructions to grant summary judgment to MOF holding invalid the per-candidate aggregate contribution limitations in Oxnard City Code §§ 2-243(A)–(B), 2-244(A)–(B). I therefore respectfully dissent.

## **APPENDIX**



OXNARD ELECTIONS: CAMPAIGN CONTRIBUTIONS

Example of the size and volume of campaign contributions for one candidate over past several years

68%
DONATIONS OF $750 AND LESS

$15,650

32%
DONATIONS MORE THAN $750

$102,400

TOTAL CAMPAIGN DONATIONS:
$118,050